**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

─────────────────────────────── x
:
YELDA MESBAH BARTLETT, LAVINIA        :    **CASE NO.: 14-cv-3790 UA**
SIMONA BIASELL, HOLLY ANN BUSS,       :
TEENA MARIE JOHNSON, LORI JO          :
KIRKHART, TRACY ELIZABETH             :    **CLASS ACTION COMPLAINT FOR**
MORENO, DAVID WAYNE NATION,           :    **MONETARY, EQUITABLE, AND**
GREGORY ROSE, LAUREN JILL             :    <u>**INJUNCTIVE RELIEF**</u>
SCHNEIDER, and RHETT                  :
MONTGOMERY TANSELLE, on Their         :    <u>**DEMAND FOR JURY TRIAL**</u>
Own Behalf and on Behalf of All Others :
Similarly Situated,                   :
:
:
               Plaintiffs,  :
:
v.                                    :
:
:
KEURIG GREEN MOUNTAIN, INC.           :
(F/K/A GREEN MOUNTAIN COFFEE          :
ROASTERS, INC.) and as Successor to   :
KEURIG, INCORPORATED,                 :
:
               Defendants.  :
:
─────────────────────────────── x

# TABLE OF CONTENTS

Page

NATURE OF THE ACTION ................................................................................................1

PARTIES ..............................................................................................................................8

    A.   Plaintiffs ................................................................................................................8

    B.   Defendant ............................................................................................................11

    C.   Agents and Co-Conspirators ..............................................................................11

JURISDICTION AND VENUE .........................................................................................12

RELEVANT MARKETS ....................................................................................................13

    A.   Relevant Product Market:  The Manufacture, Distribution, and Sale of Single-Serve Brewers ...................................................................................................13

    B.   Relevant Product Market: The Manufacture, Distribution, and Sale of Keurig Compatible Cups......................................................................................15

    C.   Single-Serve Brewers and Keurig Compatible Cups Are Sold in the United States ..................................................................................................................17

INTERSTATE COMMERCE .............................................................................................17

FACTS BEHIND THE SCHEME TO CONTROL, RESTRAIN, EXCLUDE, AND ELIMINATE COMPETITION IN THE SALE OF KEURIG SINGLE-SERVE BREWERS AND KEURIG COMPATIBLE CUPS ..............................................................19

    A.   GMCR Acquires Control Over Keurig's K-Cup Technology .........................19

    B.   Keurig Systematically Acquires Ownership or Control Over Almost Every Major Coffee and Hot Beverage Brand for Use in Keurig Compatible Cups ..............20

    C.   Keurig Enters Into Exclusionary Deals To Block Cup Competitors From Being Able To Manufacture, Distribute, and Sell Keurig Compatible Cups .........................25

    D.   Keurig Substantially Raised K-Cups Prices Twice in the Middle of an Economic Downturn for a Total of Between 19 percent and 28 percent Without Sustaining any Material Loss of Market Share ..............................................................28

    E.   Keurig Loses Its Patent Cases Against Two Cup Competitors and the Federal Circuit Finds That Keurig Sued To Harm Consumers.................................................29

        (i)   The TreeHouse/Sturm Patent Infringement Case ...................................30

        (ii)   The Rogers Family Patent Infringement Case .......................................31

HORIZONTAL CONSPIRACY TO RESTRAIN AND EXCLUDE COMPETITION AND MAINTAIN AND EXPLOIT SUPRACOMPETITIVE PRICES .......................................31

    A.   Keurig Conspires with Its Roaster Competitors To Preserve and Expand Keurig's Market Position by Foreclosing Competitors' Access To Roaster Competitors' Products, Business, and Distribution Channels ....................................31

    B.   Keurig Conspires with Its Distributor Competitors and Its Retail Competitors To Preserve and Expand Keurig's Market Position by Foreclosing Competitors' Access to Distribution and Retail Channels..................................................35

        (i)   The Away-from-Home ("AFH") Consumer Segment ...........................35

            (a)   The Identity of AFH Consumers Are Readily Ascertainable ........36

# TABLE OF CONTENTS

Page

(b) In the AFH Segment, Keurig Conspires with Its Distributor Competitors and Its Retail Competitors To Preserve and Expand Keurig's Market Position by Foreclosing Competitors' Access to AFH Distribution and Retail Channels....................................................................37

(ii) The At-Home ("AH") Consumer Segment .........................................42

(a) The Identity AH Consumers Are Readily Ascertainable..............42

(b) In the AH Segment, Keurig Conspires with Its Distributor Competitors and Its Retail Competitors To Preserve and Expand Keurig's Market Position by Foreclosing Competitors' Access to AFH Distribution and Retail Channels....................................................................43

C. Keurig Extracts Supracompetitive Prices from Consumers by Locking Them Into Keurig Single-Serve Brewers Through Its Conspiracy To Restrain and Exclude Competition in the Relevant Markets ...........................................45

D. Keurig Announces Lock-Out Technology That Will Prevent Competitive Cups from Working in Keurig Single-Serve Brewers ...........................................48

E. Keurig's Unlawful Conduct Has Harmed and Will Continue To Harm Competition and Consumers .....................................................................50

CLASS ALLEGATIONS ........................................................................................51

A. Nationwide Class Under the Laws of the State of Vermont for Monetary, Equitable, and Injunctive Relief, and Under Federal Law for Injunctive Relief Only.....................................................................................................51

B. State Law Indirect-Purchaser Classes .........................................................53

KEURIG'S VIOLATIONS OF LAW AND CLAIMS FOR RELIEF ...........................................65

FIRST CLAIM FOR RELIEF Violation of 9 V.S.A. §§ 2453, 2461, 2465, Vermont Consumer Fraud Act (Conspiracy To Monopolize – Group Boycott – Predatory Pricing) ..........65

SECOND CLAIM FOR RELIEF  Violation of 9 V.S.A. §§ 2453, 2461, 2465, Vermont Consumer Fraud Act (Unlawful Tying Under Vermont Law) ......................................................68

THIRD CLAIM FOR RELIEF (Unjust Enrichment Under Vermont Law)................................69

FOURTH CLAIM FOR RELIEF Violation of §§ 16700 et seq. & 16720 of California Business and Professions Code ("Cartwright Act") (Conspiracy to Monopolize and Restrain Trade - Group Boycott) ......................................................................70

FIFTH CLAIM FOR RELIEF  Violation of §§ 16720 & 16727 of California Business and Professions Code (Unlawful Tying Under California Law) ...........................................72

SIXTH CLAIM FOR RELIEF Violation of § 17043 of the California Business and Professions Code (Below-Cost Sales) ............................................................73

SEVENTH CLAIM FOR RELIEF Violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 (Conspiracy to Monopolize and Restrain Trade - Group Boycott)......................74

EIGHTH CLAIM FOR RELIEF Violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§1, 2, and Section 3 of the Clayton Act, 15 U.S.C. § 14 (Exclusive Dealing) ................75

# TABLE OF CONTENTS

Page

NINTH CLAIM FOR RELIEF (Violation of State Antitrust and Unfair Competition Laws)........................................................................................................................76

TENTH CLAIM FOR RELIEF (Violation of State Consumer Protection Laws & Unfair Trade Practices) ............................................................................................80

ELEVENTH CLAIM FOR RELIEF (State Common Law Unjust Enrichment and Disgorgement)......................................................................................................83

PRAYER FOR RELIEF ............................................................................................85

JURY TRIAL DEMANDED .....................................................................................87

Plaintiffs Yelda Mesbah Bartlett, Lavinia Simona Biasell, Holly Ann Buss, Teena Marie Johnson, Lori Jo Kirkhart, Tracy Elizabeth Moreno, David Wayne Nation, Gregory Rose, Lauren Jill Schneider, and Rhett Tanselle ("Plaintiffs"), on their own behalf and on behalf of all others similarly situated, bring this action for damages and injunctive relief against Defendant Keurig Green Mountain, Inc. ("Keurig" or "Defendant").  Plaintiffs allege as follows:

## NATURE OF THE ACTION

1.      This case is about a company—Keurig—that has used its market power in the single-serve coffee business to lead a conspiracy, which has harmed consumers by depriving them of access to high-quality and less-expensive alternative products.  Keurig orchestrated this conspiracy with its major horizontal competitors in order to exclude, restrain, and suppress competition in the single-serve coffee business, so that Keurig could maintain supracompetitive prices for the joint benefit of Keurig and its co-conspirators.

2.      Single-serve brewer coffee makers ("Single-Serve Brewers") are used to brew a variety of hot beverages, such as coffee, tea, and hot chocolate, in single-cup portions.  Unlike traditional hot-beverage brewer machines, Single-Serve Brewers only make one cup-sized serving at a time.  They are a speedy, convenient, and tidy way of brewing hot beverages.  A user can make a fresh cup of hot coffee in less than one minute without having to grind beans, measure coffee grounds, use a filter, and clean up the mess associated with this process.

3.      Single-Serve Brewers use "Portion Packs" that hold grounds, powders, leaves, or other material for brewing hot beverages.  Portion Packs come in many different forms such as cartridges, disks, cups, or pods.

4.      Keurig is the dominant manufacturer, distributor, and seller of a particular type of Single-Serve Brewer referred to herein as "Keurig Single-Serve Brewer(s)," and Keurig is the dominant manufacturer, distributor, and seller of a particular type of Portion Pack that can be used only in the Keurig Single-Serve Brewers.

5.      The particular type of Portion Packs that will work only in the Keurig Single-Serve Brewer is referred to as the "Keurig Compatible Cup(s)."  The Keurig Compatible Cups

- 1 -

made or licensed by Keurig itself are referred to as "Keurig K-Cups." Keurig refers to its brewer and cup business lines together as the "Keurig System," both internally and in public filings.

6.     Keurig dominates and controls at least 89 percent of the market for the manufacture, distribution, and sale of all Single-Serve Brewers in the United States. Keurig's Single-Serve Brewer competitors do not make Keurig Compatible Cups and do not compete with Keurig in the Keurig Compatible Cups Market.

7.     Keurig presently dominates and controls at least 86 percent of the United States market for the manufacture, distribution, and sale of Keurig Compatible Cups. Keurig's dominant market power is exemplified by it being able to maintain this market share despite raising prices for its Keurig K-Cups approximately 19-28 percent between 2010 and 2013.

8.     Persons or entities that make and sell Keurig Compatible Cups (other than Keurig or its licensees) are referred to herein as Keurig's "Cup Competitors."

9.     Specifically, Cup Competitors are persons or entities, other than Keurig and its business partners or licensees that are (i) in the business of roasting and supplying coffee for use in Portion Packs compatible with Keurig Single-Serve Brewers; and/or (ii) in the business of manufacturing and/or selling Portion Packs compatible with Keurig Single-Serve Brewers. These Portion Packs are not manufactured or licensed by Keurig but are intended for use in Keurig Single-Serve Brewers. The Portion Packs manufactured, distributed, sold, or licensed by Cup Competitors are referred to herein as "Competitive Cups."

10.    While some Cup Competitors report that their products can cost as much as 58 percent less than the Keurig K-Cups, contain high-quality coffee, and are 97 percent biodegradable (unlike Keurig K-Cups, which are 95 percent non-biodegradable), they cannot obtain meaningful market share due to the insurmountable cumulative barriers to entry erected by Keurig and its co-conspirators. The fact that Keurig is able to maintain its market share and supracompetitive prices in the face of lower-priced and high-quality alternatives is strong evidence of Keurig's market power and the effectiveness of its scheme to exclude competition from the Keurig Compatible Cups Market.

11.     In addition to being in the Single-Serve Brewer business and in the Portion Packs manufacturing business, Keurig has a number of other related lines of business that it uses to maintain and expand its dominant position in the markets discussed herein.

12.     Through its Green Mountain Coffee Roasters division, which is the Defendant's original sole line of business, Keurig is and has been in the coffee-roasting and coffee-processing business, which involves the purchase, roasting, and processing of coffee beans and other raw materials for packaging and sale to distributors, wholesalers, retailers, and consumers.

13.     In order to reduce and restrain competition in the business of roasting and supplying coffee for Keurig Compatible Cups, Keurig has systematically acquired in recent years many of its coffee-roaster and hot-beverage competitors ("Roaster Competitors"), including, among others, Tully's Coffee Corporation, Timothy's Coffees, Diedrich Coffee, Inc., and LNH Holdings, Inc. (Van Houtte).

14.     In order to control and further reduce the threat of competition in the business of roasting and supplying coffee for Keurig Compatible Cups, Keurig has negotiated exclusionary licensing and manufacturing agreements with most of the other Roaster Competitors that it was not able to acquire.  These Roaster Competitors include, among others, the following brands: Starbucks, Folgers, The Coffee Bean & Tea Leaf, Millstone, Dunkin' Donuts, Cinnabon, Inc., Wolfgang Puck, Newman's Own Organics Coffee, Celestial Seasonings, Twinings, and Bigelow. These horizontal agreements prohibit Keurig's Roaster Competitors from doing business with Cup Competitors (defined in Paragraphs 8-9, above).

15.     Upon information and belief, under these exclusionary horizontal agreements the Roaster Competitors agree not to do business with any of Keurig's Cup Competitors. Specifically, these agreements prevent any person or entity but Keurig from having access to Roaster Competitors' products and brand names for use in Keurig Compatible Cups.  The purpose of these agreements is to exclude and restrain competition and maintain supracompetitive Keurig K-Cup prices for the common benefit of Keurig and the Roaster Competitors.

16.     Keurig is also in the hot-beverage and coffee distribution business, which involves, among other things, selling Keurig Single-Serve Brewers and Keurig K-Cups to third parties for resale to retailers or end-user consumers.  To restrict, restrain, and reduce competition in the distribution of these products, Keurig has exclusive agreements with many of its competitors in the hot-beverage and coffee distribution business ("Distributor Competitors").  In these agreements, Keurig conditions the sale of Single-Serve Brewers on the Distributor Competitor's agreement to buy, distribute, and sell Keurig K-Cups as well as the agreement not to purchase or sell Competitive Cups.  These horizontal agreements, upon information and belief, prohibit Keurig's Distributor Competitors from doing business with Cup Competitors.  The purpose of these horizontal agreements is to restrict, restrain, and reduce competition and maintain supracompetitive Keurig K-Cup prices for the common benefit of Keurig and the group of Distributor Competitors.

17.     Keurig is also in the single-serve hot-beverage and coffee retail business, which includes Keurig's direct sales to consumers of Keurig Single-Serve Brewers and Keurig K-Cups via its online retail store available at http://wwwkeurigcom/Keurig-Store.  Upon information and belief, Keurig has exclusionary agreements with many of its major competitors in the hot-beverage and retail business ("Retail Competitors").  Upon information and belief, in some of these agreements, Keurig conditions the sale of Single-Serve Brewers on the Retailer Competitor's agreement to buy, distribute, and sell Keurig K-Cups as well as the agreement not to purchase or sell Competitor Cups.  In other exclusionary agreements with Retailer Competitors, upon information and belief, Keurig requires that Retail Competitors greatly limit the volume of Competitive Cups they purchase and sell, or requires them to limit the number of stores or geographic areas where Competitive Cups are sold. The purpose of these horizontal agreements is to restrict, restrain, and reduce competition and maintain supracompetitive Keurig K-Cup prices for the common benefit of Keurig and the group of Retail Competitors.

18.    The horizontal nature of Keurig's various exclusionary agreements and relationships is illustrated by the below chart.



19.    With the support and agreement of its co-conspirators, Keurig conspired to acquire, control, dominate, monopolize, and manipulate the relevant markets discussed below. In order to restrict, restrain, reduce, and foreclose competition in the Single-Serve Brewers and the Keurig Compatible Cups Markets, Keurig designed, with the support and agreement of its co-conspirators, the following multi-faceted plan:

(a)    Keurig interfered with Cup Competitors' ability to make Competitive Cups by entering into exclusive dealing arrangements that prevented manufacturers of equipment used to make Keurig Compatible Cups from selling such equipment to Cup Competitors.

(b)    Keurig entered into exclusive-dealing arrangements with the primary suppliers of components used to make Keurig Compatible Cups to limit or prohibit suppliers

- 5 -

from selling to Cup Competitors the components needed to manufacture Competitive Cups.

(c)     Keurig entered into multi-year exclusive licensing agreements with its Roaster Competitors, or systematically acquired its Roaster Competitors, in order to lock up control of major Roaster Competitor's products for use in Keurig Compatible Cups and prevent Roaster Competitors from doing business with Cup Competitors, all of which enforces a concerted refusal to deal with Cup Competitors (*i.e.*, a group boycott).

(d)     Keurig entered into multi-year horizontal, exclusive deals with Distributor Competitors and Retail Competitors who agree not to do business or to severely limit the volume of business they do with Cup Competitors, all of which enforces a concerted refusal to deal with Cup Competitors (*i.e.*, a group boycott).

(e)     Keurig leverages and uses its monopoly in the Single-Serve Brewers market to restrain and foreclose competition in the Keurig Compatible Cups Market by selling Keurig Single-Serve Brewers at cost or at a loss.

(f)     Keurig uses its market power in the Single-Serve Brewers market to coerce and tie the sales of Keurig Single-Serve Brewers to the purchase of Keurig K-Cups to the exclusion of Competitive Cups.

20.     At no time during the relevant period did Keurig's Cup Competitors have more than 8-14 percent of the market for Keurig Compatible Cups.  Even so, Keurig sought to recapture 100 percent of the market, as described in more detail below.

21.     In order to foreclose competition from Cup Competitors, Keurig has engaged in other exclusionary and anticompetitive conduct to maintain its dominance in the Single-Serve Brewers Market and to recapture the market share presently held by Cup Competitors in the Keurig Compatible Cups Market.

22.     On November 20, 2013, Keurig announced that it would be launching the next generation of Keurig Single-Serve Brewers—the "Keurig 2.0 Brewer(s)"—that would only work

with "Keurig 2.0 K-Cups."  By design, Competitive Cups will not work in the Keurig 2.0 Brewer, because they will have "lock-out technology."  And the November 20, 2013 announcement of the Keurig 2.0 Brewer and Keurig 2.0 K-Cups was a planned effort by Keurig and its co-conspirators to undermine the ability of Cup Competitors to compete with Keurig for the sale of Keurig Compatible Cups.

23.      Upon information and belief, the threat of the Keurig 2.0 Brewer has already hindered competition by scaring off actual and potential customers from purchasing Competitive Cups because Competitive Cups will not work in the Keurig 2.0 Brewer.

24.      Keurig has used the Keurig 2.0 Brewer to try to coerce Cup Competitors to "convert" from being independent Cup Competitors to becoming licensees in the Keurig System, because agreeing to a license with Keurig is the only way that Competitive Cups will work in the Keurig 2.0 Brewer.  This lock-out technology is an additional hammer with which Keurig can restrain and exclude competition in the Keurig Compatible Cups Market.

25.      Keurig's exclusionary conduct also prevents consumers from being able to freely choose high-quality, less-expensive, and environmentally friendly Competitive Cups.  Unlike some Competitive Cups that are 97 percent biodegradable, Keurig K-Cups are 95 percent non-biodegradable.

26.      Since at least 2008, as alleged herein, Keurig's actions have harmed consumers economically by forcing consumers to pay supracompetitive prices for Keurig K-Cups.  Absent redress, consumers will continue to be harmed.

27.      Plaintiffs and members of the class purchased K-Cups indirectly for their own use and not for resale.  Plaintiffs bring this class action against Keurig for damages, other monetary relief, equitable, and injunctive relief under certain state antitrust, unfair competition, consumer protection, and unjust enrichment laws.  Plaintiffs also bring this action for injunctive relief for violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2, and Section 3 of the Clayton Act, 15 U.S.C. § 14.  This class action seeks to stop Keurig and its co-conspirators from continuing to restrict, restrain, foreclose, and exclude competition, and to compensate Plaintiffs

and the class of consumers that has been damaged by the unlawful activities of Keurig and its co-conspirators.

## PARTIES

### A.    Plaintiffs

28.    Yelda Mesbah Bartlett ("Bartlett") is a resident and citizen of the State of California, County of Alameda.  During the class periods (defined below), in California, Bartlett indirectly purchased for her own use and not for resale at least one Keurig Single-Serve Brewer and at least one Keurig K-Cup that was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers.  As a direct and proximate result of Keurig's anticompetitive conduct, Bartlett paid supracompetitive prices for Keurig K-Cups, was harmed as a result, and will continue to sustain injury when purchasing Keurig K-Cups unless Keurig is enjoined from continuing its unlawful conduct.  Bartlett still owns a Keurig Single-Serve Brewer and does purchase and will continue to purchase Keurig K-Cups in California.

29.    Lavinia Simona Biasell ("Biasell") is a resident and citizen of the State of Michigan, County of Oakland.  During the class periods (defined below), in Michigan, Biasell indirectly purchased for her own use and not for resale at least one Keurig Single-Serve Brewer and at least one Keurig K-Cup that was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers.  As a direct and proximate result of Keurig's anticompetitive conduct, Biasell paid supracompetitive prices for Keurig K-Cups, was harmed as a result, and will continue to sustain injury when purchasing Keurig K-Cups unless Keurig is enjoined from continuing its unlawful conduct.  Biasell still owns a Keurig Single-Serve Brewer and does purchase and will continue to purchase Keurig K-Cups in Michigan.

30.    Holly Ann Buss ("Buss") is a resident and citizen of the State of Michigan, County of Kent.  During the class periods (defined below), in Michigan, Buss indirectly purchased for her own use and not for resale at least one Keurig Single-Serve Brewer and at least one Keurig K-Cup that was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers.  As a direct and proximate result of Keurig's anticompetitive conduct, Buss paid

supracompetitive prices for Keurig K-Cups, was harmed as a result, and will continue to sustain injury when purchasing Keurig K-Cups unless Keurig is enjoined from continuing its unlawful conduct.  Buss still owns a Keurig Single-Serve Brewer and does purchase and will continue to purchase Keurig K-Cups in Michigan.

31.     Teena Marie Johnson ("Johnson") is a resident and citizen of the State of Kansas, County of Douglas.  During the class periods (defined below), Johnson, in Kansas, indirectly purchased for her own use and not for resale at least one Keurig Single-Serve Brewer and at least one Keurig K-Cup that's was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers.  As a direct and proximate result of Keurig's anticompetitive conduct, Johnson paid supracompetitive prices for Keurig K-Cups, was harmed as a result, and will continue to sustain injury when purchasing Keurig K-Cups unless Keurig is enjoined from continuing its unlawful conduct.  Johnson still owns a Keurig Single-Serve Brewer and does purchase and will continue to purchase Keurig K-Cups in Kansas.

32.     Lori Jo Kirkhart ("Kirkhart") is a resident and citizen of the State of Kansas, County of Sedgwick.  During the class periods (defined below), Kirkhart, in Kansas, indirectly obtained for her own use and not for resale at least one Keurig Single-Serve Brewer and indirectly purchased at least one Keurig K-Cup that's was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers.  As a direct and proximate result of Keurig's anticompetitive conduct, Kirkhart paid supracompetitive prices for Keurig K-Cups, was harmed as a result, and will continue to sustain injury when purchasing Keurig K-Cups unless Keurig is enjoined from continuing its unlawful conduct.  Kirkhart still owns a Keurig Single-Serve Brewer and does purchase and will continue to purchase Keurig K-Cups in Kansas.

33.     Tracy Elizabeth Moreno ("Moreno") is a resident and citizen of the State of Arizona, County of Pima.  During the class periods (defined below), in Arizona, Moreno indirectly purchased for her own use and not for resale at least one Keurig Single-Serve Brewer and at least one Keurig K-Cup that was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers.  As a direct and proximate result of Keurig's anticompetitive

conduct, Moreno paid supracompetitive prices for Keurig K-Cups, was harmed as a result, and will continue to sustain injury when purchasing Keurig K-Cups unless Keurig is enjoined from continuing its unlawful conduct.  Moreno still owns a Keurig Single-Serve Brewer and does purchase and will continue to purchase Keurig K-Cups in Arizona.

34.     David Wayne Nation ("Nation") is a resident and citizen of the District of Columbia.  During the class periods (defined below), in Virginia, Nation indirectly purchased for his own use and not for resale at least one Keurig Single-Serve Brewer, and in the District of Columbia, Maryland, New Mexico, and Virginia indirectly purchased at least one Keurig K-Cup in jurisdiction that was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers.  As a direct and proximate result of Keurig's anticompetitive conduct, Nation paid supracompetitive prices for Keurig K-Cups, was harmed as a result, and will continue to sustain injury when purchasing Keurig K-Cups unless Keurig is enjoined from continuing its unlawful conduct.  Nation still owns a Keurig Single-Serve Brewer and does purchase and will continue to purchase Keurig K-Cups in the future in the District of Columbia and in New Mexico.

35.     Gregory Rose ("Rose") is a resident and citizen of the State of New York, County of New York.  During the class periods (defined below), Rose, in New York, indirectly purchased for his own use and not for resale at least one Keurig Single-Serve Brewer and at least one Keurig K-Cup that was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers.  As a direct and proximate result of Keurig's anticompetitive conduct, Rose paid supracompetitive prices for Keurig K-Cups, was harmed as a result, and will continue to sustain injury when purchasing Keurig K-Cups unless Keurig is enjoined from continuing its unlawful conduct.  Rose still owns a Keurig Single-Serve Brewer and does purchase and will continue to purchase Keurig K-Cups in New York.

36.     Lauren Jill Schneider ("Schneider") is a resident and citizen of the State of Florida, County of Palm Beach.  During the class periods (defined below), Schneider, in Florida, indirectly purchased for her own use and not for resale at least one Keurig Single-Serve Brewer and at least one Keurig K-Cup that's was manufactured or licensed by Keurig, its subsidiaries,

affiliates, or joint venturers.  As a direct and proximate result of Keurig's anticompetitive conduct, Schneider paid supracompetitive prices for Keurig K-Cups, was harmed as a result, and will continue to sustain injury when purchasing Keurig K-Cups unless Keurig is enjoined from continuing its unlawful conduct.  Schneider still owns a Keurig Single-Serve Brewer and does purchase and will continue to purchase Keurig K-Cups in Florida.

37.     Rhett Montgomery Tanselle ("Tanselle") is a resident and citizen of the State of New York, County of New York.  During the class periods (defined below), Tanselle, in New York, indirectly obtained for his own use and not for resale at least one Keurig Single-Serve Brewer and at least one Keurig K-Cup that was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers.  As a direct and proximate result of Keurig's anticompetitive conduct, Tanselle paid supracompetitive prices for Keurig K-Cups, was harmed as a result, and will continue to sustain injury when purchasing Keurig K-Cups unless Keurig is enjoined from continuing its unlawful conduct.  Tanselle still owns a Keurig Single-Serve Brewer and does purchase and will continue to purchase Keurig K-Cups in New York.

**B.     Defendant**

38.     Defendant Keurig Green Mountain, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business and headquarters in Waterbury, Vermont.  Until March 6, 2014, Defendant was known as Green Mountain Coffee Roasters, Inc. ("GMCR"), which was headquartered in Vermont.  Defendant is also the successor to Keurig, Inc., which, prior to its merger with GMCR on December 31, 2013, was a wholly owned subsidiary of GMCR organized under the laws of the State of Delaware with a principal place of business in Reading, Massachusetts.  On March 10, 2014, GMCR and Keurig Inc. announced that they had changed their names to Keurig Green Mountain, Inc., simply referred to as "Keurig" or "Defendant" herein.

**C.     Agents and Co-Conspirators**

39.     In every state and territory of the United States, various persons and entities other than Keurig—including Roaster Competitors, Distributor Competitors, and Retail Competitors—

have horizontally conspired in the violations alleged herein and have performed acts and made statements in furtherance of the conspiracy and/or related conspiracies designed to maintain, expand, and abuse Keurig's market power and monopoly in the Relevant Markets (defined below). These other persons and entities have facilitated, participated in, and aided and abetted the conspiracy. The co-conspirators committed overt acts and communicated with others in the conspiracy to monopolize, restrain, restrict, exclude, and foreclose competition in the Relevant Markets (defined below) in every state and territory of the United States. The conspiracy's center of gravity is and was Vermont, where Keurig is headquartered. Keurig's conduct in Vermont, and related conduct occurring in every other state, substantially affected and continues to affect a substantial amount of trade and commerce and has injured consumers in *every* state and territory of the United States.

## JURISDICTION AND VENUE

40.    Plaintiffs seek to recover damages, restitution, consideration paid, treble damages or three times consideration given by consumers for K-Cups, disgorgement, other monetary relief, injunctive and other equitable relief under state antitrust and consumer protection laws and state unjust enrichment laws, and costs of suit, including reasonable attorneys' fees, for the injuries that Plaintiffs and all others similarly situated sustained as a result of Keurig's violations of those laws. This complaint is also filed under Section 16 of the Clayton Act, 15 U.S.C. §26, to obtain injunctive relief and to recover the costs of suit, including reasonable attorneys' fees, for the injuries sustained by Plaintiffs and all others similarly situated as a result of Keurig's violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§1-2.

41.    This Court has jurisdiction over the federal claims under 28 U.S.C. §§1331, 1337. The Court has jurisdiction over the state law claims under 28 U.S.C. §1367 because those claims are so related to the federal claim that they form part of the same case or controversy. This Court also has jurisdiction over the state law claims under 28 U.S.C. §1332 because the amount in controversy for the class exceeds $5,000,000 and there are members of the class who are citizens of a different state than Keurig.

42.     Venue is proper in this Judicial District because Keurig transacts a substantial amount of business in this District, conspires to exclude and restrain competition in this District, and continues to affect a substantial amount of trade and commerce in this District.

## RELEVANT MARKETS

43.     The overall market is the single-serve coffee and other hot-beverage market. There are two related relevant-product markets that have been and continue to be impacted by Keurig's and its co-conspirators' anticompetitive conduct: (1) the market for the manufacture, distribution, and sale of single-serve coffee brewers ("Single-Serve Brewer(s) Market"); and (2) the market for the manufacture, distribution, and sale of single-serve disposable hot-beverage pods/cartridges, and products for use in Keurig Single-Serve Brewers ("Keurig Compatible Cup(s) Market").

44.     The geographic market affected by Keurig's and its co-conspirators' illegal activities is the United States, including all of its states and territories.

**A.     Relevant Product Market:  The Manufacture, Distribution, and Sale of Single-Serve Brewers**

45.     The Single-Serve Brewer Market is a relevant product market impacted by the unlawful conduct alleged in this Complaint.

46.     Single-Serve Brewers are a speedy, convenient, and tidy way for consumers to brew single cups of hot beverages such as coffee, tea, or hot chocolate.  These brewers can brew a single hot cup of a beverage in less than a minute without the need for consumers to grind beans, measure coffee, handle used filters, or clean up after the preparation.

47.     To brew a single cup, consumers insert a Portion Pack—which can take the form of a cup, pod, or other container filled with the product—into the brewer.  The brewer then forces hot water through the Portion Pack and a single serving of the hot beverage is delivered directly into the cup.

48.     Because the Single-Serve Brewers have such unique attributes, the price of traditional drip coffee makers does not significantly constrain prices for Single-Serve Brewers.

Consumers are willing to pay a premium for Single-Serve Brewers over the price of traditional drip coffee makers. For example, a traditional drip coffee maker is often sold for roughly $25 to $35, whereas a Single-Serve Brewer would generally cost between $80 to several hundred dollars.

49.      Keurig manufactures, distributes, and sells a number of different Single-Serve Brewers under the brand name "Keurig"—including Keurig K-Cup Brewers, Vue Brewers, and Rivo Brewers. The price of Keurig Single-Serve Brewers ranges from $89.95 to $249.95. Keurig also licenses its Single-Serve Brewer technology to several brands, such as Cuisinart, Breville, and Mr. Coffee.

50.      Keurig Single-Serve Brewers use Portion Packs that are not compatible with other types of Single-Serve Brewer machines. Similarly, Single-Serve Brewers manufactured by Keurig's brewer competitors use Portion Packs that are not compatible with the Keurig Single-Serve Brewers. Other types of Single-Serve Brewer machines include Mars, Inc.'s "Flavia Single-Serve Brewers," Bosch's "Tassimo Single Brewers," and Philips Electronics's "Senseo Single-Serve Brewers." Prices for Single-Serve Brewers made by these manufacturers can vary greatly and can differ by as much as several hundred dollars.

51.      Keurig has dominant control over the major coffee brands available for use in Portion Packs and has dominant control over the Portion Pack distribution channels. This dominance creates additional barriers to entry into the Single-Serve Brewers Market.

52.      When consumers purchase a Keurig Single-Serve Brewer they know that a wide variety of coffee brands will be available to them through various sources, but they are unaware that most of these brands are owned or controlled by Keurig and its co-conspirators.

53.      Barriers to entry in the Single-Serve Brewers Market have proven effective and non-Keurig Single-Serve Brewers hold less than 11 percent of the Single-Serve Brewers Market. As such, competition in the Single-Serve Brewers Market is insufficient to provide effective competition against Keurig's market power in the Keurig Compatible Cups Market.

**B.      Relevant Product Market: The Manufacture, Distribution, and Sale of Keurig Compatible Cups**

54.      The Keurig Compatible Cup Market is a relevant product market impacted by the unlawful conduct alleged in this Complaint.

55.      Keurig's own Keurig Compatible Cup, referred to herein as the Keurig K-Cup, is a specific Portion Pack for use in Keurig Single-Serve Brewers.  Keurig extracts supracompetitive prices from consumers through sales of the Keurig K-Cup.  Keurig records, monitors, and reports its sales of Keurig K-Cups separately from other Keurig products. Keurig's ability to increase the price of its Keurig K-Cups above competitive levels is not constrained by Portion Packs used with non-Keurig Single-Serve Brewers because those Portion Packs do not work in Keurig Single-Serve Brewers.

56.      A variety of Portion Packs, including K-Cups, T-Discs, and pods, are marketed by Portion Pack competitors, as are shown by the images below.  Keurig Single-Serve Brewers, however, only work if a Keurig Compatible Cup is used.  Likewise, Tassimo brand Single-Serve Brewers will only work with Tassimo T-Discs; Flavia Single-Serve Brewers will only work with Flavia-style pods (sometimes branded under the name Alterra); and Senseo Single-Serve Brewers will only work with Senseo-style pods.  Non-Keurig Compatible Cups function differently and their unique physical appearance makes it clear that they will not work in Keurig Single-Serve Brewers.



**Keurig K-Cup**        **Senseo Pod**        **Flavia/Alttera Pod**        **Tassimo T-Disc**

57.      As shown by the images below, Keurig Compatible Cups and other types of Portion Packs are not reasonably interchangeable.  A Flavia brewer owner would not consider

Keurig Compatible Cups to be reasonably interchangeable with Flavia-style pods. The opposite is also true: Keurig Single-Serve Brewers consumers would not consider Flavia-style pods to be reasonably interchangeable with Keurig Compatible Cups. Thus, consumers are locked into using only Portion Packs designed to work with their specific and unique Single-Serve Brewer.



**Senseo Brewer**



**Tassimo Brewer**



**Flavia Brewer**

**Keurig Brewer**

58.     Even if the price of Keurig Compatible Cups increases substantially, consumers are unlikely to invest an additional $80 or more to purchase a non-Keurig Single-Serve Brewer in order to be able to buy non-Keurig-compatible Portion Packs as a way to avoid paying supracompetitive prices for Keurig K-Cups. Accordingly, switching costs (how much it would cost for a consumer to purchase a different Single-Serve Brewer) in the Single-Serve Brewers market restrains consumers from purchasing Portion Packs that are not compatible with Keurig Single-Serve Brewers.

59.     Accordingly, small but significant non-transitory increases in the price of Keurig Compatible Cups, or Keurig K-Cups, do not significantly increase demand for T-Discs, Flavia-style pods, Senseo-style pods, or other types of single-serve Portion Packs that are not compatible with Keurig Single-Serve Brewers.

60.     Also, Keurig's ability to increase the price of Keurig K-Cups above competitive levels has not been reasonably constrained by the price of ground coffee. The price of coffee sold in Keurig's K-Cups is more than four times greater than that of ground coffee. Due to

enhanced convenience and simplicity, consumers are willing to pay a substantial premium for coffee that can be brewed in Single-Serve Brewers.

61.     For example, the *New York Times* stated that "Folgers [K-Cups], with 8 grams per capsule, work[] out to more than $50 a pound," which is "even more expensive than all but the priciest coffees sold by artisanal roasters, the stuff of coffee snobs."




### C.     Single-Serve Brewers and Keurig Compatible Cups Are Sold in the United States

62.     The relevant geographic market is the United States, including all of its states and territories.  To compete effectively within the United States, Single-Serve Brewer and Keurig Compatible Cup manufacturers and sellers need relationships with roasters that have distribution assets as well as relationships with others within the United States that would permit them to meaningfully compete.  Single-Serve Brewers and Keurig Compatible Cup manufacturers and sellers located outside of the United States do not have such assets and relationships; thus, they are not able to constrain prices in the Relevant Markets.

### INTERSTATE COMMERCE

63.     Keurig manufactures and sells Keurig Single-Serve Brewers and Keurig K-Cups in the United States in a continuous and uninterrupted flow of interstate commerce, including in this District.

64.     Keurig's business substantially affects interstate commerce in the United States, affects a substantial volume of trade and commerce in each state and territory of the United

States, and has caused and continues to cause a substantial amount of economic harm and antitrust injury to the citizens of each state and territory of the United States.

65.     Keurig has manufacturing and distribution operations throughout the United States and sells and/or distributes throughout the United States.

66.     Keurig stated in its most recent Annual Report:

> For fiscal 2013, approximately **92% of our consolidated net sales was attributed to the combination of portion packs and Keurig Single Cup brewers** and related accessories. Fiscal 2013 **net sales of $4,358.1 million were comprised of $3,187.3 million portion pack net sales**, $827.6 million Keurig Single Cup Brewer and accessories net sales and $343.2 million of other product net sales such as whole bean and ground coffee selections in bags, fractional packages, and cans, as well as cups, lids and ancillary items to our customers primarily in the U.S. and Canada.

> (Emphasis added.)

67.     Of Keurig's total net sales of $4.358 billion for fiscal year 2013, $3.725 billion were in the United States.  The total figure includes **$3.187 billion in Keurig K-Cup net sales**.

68.     Keurig has a presence throughout the United States, with its headquarters, executive offices, production, distribution, manufacturing, and research facilities centralized in Vermont, and large manufacturing and distribution facilities located in Vermont, Tennessee, California, Virginia, and Washington.

69.     The activities of Keurig and its co-conspirators, as alleged herein, were within the flow of, were intended to, and did have a substantial effect on the foreign and interstate commerce of the United States.

70.     The conspiracy alleged herein was formulated in and emanated from Vermont. The conspiracy impacted and harmed consumers in every state and territory of the United States. Upon information and belief, Keurig, from its headquarters in Vermont, formulated, conceived of, and reached unlawful conspiratorial and anticompetitive agreements with its Roaster Competitors, Distributor Competitors, and Retail Competitors that were intended to and did harm competition and consumers in every state and territory of the United States.  The effect of this conduct, emanating from Vermont, was to cause consumers to be charged supracompetitive

prices for Keurig K-Cups in every state and territory of the United States.  Thus, Keurig's and its co-conspirators' conduct substantially affected trade and commerce in each state and territory of the United States.

**FACTS BEHIND THE SCHEME TO CONTROL, RESTRAIN, EXCLUDE, AND ELIMINATE COMPETITION IN THE SALE OF KEURIG SINGLE-SERVE BREWERS AND KEURIG COMPATIBLE CUPS**

**A.      GMCR Acquires Control Over Keurig's K-Cup Technology**

71.      In the 1990s, one of Keurig's predecessor entities, Keurig, Inc., developed Keurig Single-Serve Brewers and Keurig K-Cups, and obtained patents for some of the technology used in those brewers and for some of the technology associated with the Keurig K-Cups.

72.      Leveraging off of that innovative technology, Keurig, Inc. licensed various coffee roasting companies, including GMCR, for the manufacture and sale of coffee in Keurig K-Cups.

73.      In 2002, Keurig expanded the Single-Serve Brewer Market by introducing its Keurig Single-Serve Brewer for home use.

74.      Upon information and belief, GMCR started in 1981 as a small café in Waitsfield, Vermont and grew to be a very profitable and successful coffee roasting and distribution company, which became a public company headquartered in Vermont in 1993.

75.      In order to combine its coffee roasting business with the Single-Serve Brewer business of Keurig, Inc., GMCR bought 42 percent of Keurig, Inc. for $15 million in 2002, and in 2006 GMCR acquired the remainder of Keurig, Inc. for $104 million.  GMCR acquisition of Keurig, Inc. was an important step in Defendant's plan to dominate the Relevant Markets.

76.      In early 2014, the Vermont-based company changed its name to Keurig Green Mountain, Inc., simply referred to as "Keurig" herein.

77.      Since its acquisition of Keurig, Inc., Keurig systematically made further acquisitions and acquired greater control over the Single-Serve Brewer Market and the Keurig Compatible Cup Market.  Keurig eventually amassed almost 100 percent monopoly power in the Single-Serve Brewer Market and the Keurig Compatible Cup Market.

78.     Keurig is headquartered in Vermont where, upon information and belief, it has a massive 90,000 square-foot roasting and manufacturing facility, corporate and professional headquarters, research and development center, and distribution facilities.

79.     Upon information and belief, Keurig's scheme was hatched and orchestrated in and from Vermont, which is the center of gravity of the conspiracy alleged herein.

**B.      Keurig Systematically Acquires Ownership or Control Over Almost Every Major Coffee and Hot Beverage Brand for Use in Keurig Compatible Cups**

80.     Upon information and belief, Keurig determined at least as early as the mid-2000s that its goal of controlling and exploiting the Keurig Compatible Cups Market would be achieved by buying up Roaster Competitors—who might make Competitive Cups—and by entering into restrictive licensing or manufacturing deals with Roaster Competitors, which it was not able to acquire, in order to prevent them from doing business with any potential Cup Competitors.

81.     Before GMCR acquired Keurig, upon information and belief, Keurig, Inc.'s licensing deals (some of them long-term) with roasters enhanced and fostered competition in the industry because the agreements were not restrictive or exclusive.  Roasters were free to make their own Keurig Compatible Cups or contract with Cup Competitors to make Keurig Compatible Cups.

82.     After GMCR's acquisition of Keurig, Inc., free and open competition became the antithesis of Keurig's new business model, because Roaster Competitors had the potential to use such agreements to greatly expand into the Keurig Compatible Cup Market.  To Keurig, the existing arrangements were an impediment to its goal of maintaining, expanding, and exploiting its market power in the Relevant Markets.  Thus, Keurig began a campaign to undo Keurig Inc.'s prior agreements by either buying up Roaster Competitors who had legacy K-Cup licensing deals or by converting such deals into exclusive and restrictive exclusionary deals.

83.     Keurig's acquisition of Roaster Competitors was important to its ability to dominate, control, and exploit the Compatible Cup Market, because many of Keurig's patents for

the K-Cup technology were set to expire in 2012 and potential Cup Competitors were researching ways to manufacture Competitive Cups that did not infringe Keurig's patents.

84.     In 2006, Keurig put its scheme into action by inking a multi-year agreement with Caribou Coffee Company, Inc. ("Caribou") to package and sell coffee in Keurig K-Cups.  The parties amended their agreement in December 2011, and under this five-year deal Caribou exclusively sells Keurig coffee that Keurig puts into Keurig K-Cups and grants Keurig a license to use the Caribou trademarks in connection with the marketing and sale of Caribou K-Cups. This agreement also prevents Caribou from doing business with any Cup Competitors.

85.     Keurig schemed to maintain, expand, and exploit its control of the Relevant Markets by implementing the systematic acquisition of other Roaster Competitors who might eventually pose a threat to Keurig's control of these markets.

86.     In 2009, Keurig acquired Tully's Coffee Corporation and Timothy's Coffees of the World, Inc.

87.     In 2010, Keurig acquired Diedrich Coffee, Inc. and LNH Holdings, Inc. (Van Houtte).

88.     David Einhorn, an analyst and well-known stock short-seller, observed, "[Keurig] eliminated the licensees by buying them. . . . [And Keurig] paid high prices to avoid having to compete with the licensees post patent expiration."  Indeed, Keurig "overpa[id] to buy [its] licensees back via acquisitions."  "The very high allocations to Goodwill raised suspicion about subsequent earnings quality." David Einhorn, GAAP-uccino, Greenlight Capital Value Investing Congress (Oct. 17, 2011), http://wwwmarketfollycom/2011/10/david-einhorn-short-green-mountainhtml.

89.     When Keurig could not acquire its Roaster Competitors outright, it entered into exclusive contracts with them and effectively acquired complete control of the Roaster Competitors' Keurig Compatible Cup businesses.

90.     Keurig uses two primary types of exclusive contracts to control Keurig Compatible Cup manufacturing and sales: (1) licensing agreements and (2) manufacturing arrangements.

91.     Keurig generically describes its licensing agreements as follows:

> Under licensing arrangements, we license the right to manufacture, distribute and sell the finished products through our distribution channels using the brand owners' marks.  For the right to use a brand owner's mark, we may pay a royalty to the brand owner based on our sales of finished products that contain the brand owner's mark.

Upon information and belief, these licensing agreements preclude the Roaster Competitors from doing business with Cup Competitors.

92.     Keurig generically describes its manufacturing arrangements as follows:

> Under manufacturing arrangements, we manufacture finished beverage products using raw materials sourced by us or provided by the brand owner.  In both instances, once the manufacturing process is complete, we sell the finished product either to the brand owner or to our customers.  Under certain manufacturing arrangements, our sole customer is the brand owner and we are prohibited from selling the beverage products to other types of customers through our distribution channels.  Under other manufacturing arrangements, in addition to manufacturing the beverage for sale to the brand owner, we have the right to sell the beverages using the brand owner's marks in certain of our channels through a licensing arrangement, as described above.

Upon information and belief, these manufacturing agreements preclude the Roaster Competitors from doing business with Cup Competitors.

93.     In February 2010, Keurig signed a multi-year agreement with J.M. Smucker Company ("Smucker"), a leader in the retail coffee business, under which Keurig is the exclusive manufacturer of K-Cups under Smucker's Folgers and Millstone brands.  Smucker sells the licensed K-Cups in grocery stores, mass merchandise stores, drugstores, wholesale clubs, and on Smucker's website.  Upon information and belief, Smucker is precluded from doing business with Cup Competitors.

94.     In February 2011, Dunkin' Donuts, a market leader in the United States coffee business, entered into a deal with Keurig under which Keurig is the exclusive manufacturer of

Dunkin' Donuts K-Cups.  The parties agreed that Dunkin' Donuts K-Cups would be sold exclusively at Dunkin' Donuts restaurants and not grocery stores, where Dunkin' Donuts sells its bagged coffee.  The parties also agreed that some Dunkin' Donuts restaurants would sell Keurig Single-Serve Brewers.  Upon information and belief, Dunkin' Donuts is precluded from doing business with Cup Competitors.

95.     In March 2011, Starbucks signed a multi-year agreement to have Keurig manufacture, market, distribute, and sell Starbucks-branded K-Cups.  This was an important step in Keurig's plan to solidify its long-term control of the Relevant Markets, because Starbucks is the world's largest coffee retailer.  Starbucks and Keurig expanded their agreement in May 2013 with a minimum five-year agreement, under which Starbucks is licensed as the exclusive, super-premium coffee brand for Keurig and the Keurig Single-Serve Brewer is ''the exclusive low pressure single cup brewing system for fresh-brewed Starbucks coffee.''  Starbucks, upon information and belief, is precluded from doing business with Cup Competitors.




96.     The Starbucks-Keurig deal also allows Keurig to manufacture and sell K-Cups for Starbucks' other brands, including Seattle's Best.

97.     In May 2013, The Coffee Bean & Tea Leaf ("Coffee Bean") signed a multi-year deal with Keurig.  Coffee Bean is the largest privately held specialty coffee and tea retailer in the United States.  This agreement gives Keurig the right to sell Coffee Bean K-Cups through multiple distribution paths beginning in the spring of 2014.  Upon information and belief, Coffee Bean is precluded from doing business with Cup Competitors.

98.     In July 2013, Cinnabon, Inc. ("Cinnabon") signed a multi-year deal with Keurig allowing Keurig to manufacture and sell Cinnabon K-Cups through a variety of distribution channels.  Upon information and belief, Cinnabon is precluded from doing business with Cup Competitors.

  

99.     Keurig has also locked up other major brands of hot beverage and coffee products through anti-competitive deals with companies such as Wolfgang Puck, Gloria Jean's Coffee, Newman's Own Organics Coffee, Celestial Seasonings, Twinings, Bigelow, and others.  Upon information and belief, each of these Roaster Competitors is precluded from doing business with Cup Competitors.

100.    Upon information and belief, these exclusionary licensing and manufacturing agreements between Keurig and Roaster Competitors contain restrictions that dictate *where and how* licensed K-Cups can be sold, giving Keurig greater ability to charge supracompetitive prices across licensed brands by controlling output, customer base, and territorial allocation of sales. Keurig's Roaster Competitors are rewarded with a share of the additional revenues generated by Keurig's supracompetitive prices.  Roaster Competitors, however, who do not cooperate with the conspiracy, are effectively shut out of the Keurig Compatible Cup Market, since they have no reasonable alternative way to enter the Keurig Compatible Cup Market in a meaningful and profitable way.  Due to Keurig's control of the market, Roaster Competitors are forced to either cooperate with Keurig in the conspiracy or to not meaningfully participate in the Keurig Compatible Cups Market at all.

101.    These arrangements have resulted in Keurig's Roaster Competitors (1) excluding Cup Competitors from obtaining contracts to manufacture and/or sell Competitive Cups for

Roaster Competitors, and (2) collectively boycotting Cup Competitors and refusing to sell coffee and other products to Cup Competitors for use in their Competitive Cups.  These arrangements were intended to and do restrain, exclude, and foreclose a substantial amount of competition in the Keurig Compatible Cup Market, preserving Keurig's and its co-conspirators' ability to charge supracompetitive prices, maximize profits for Keurig and its co-conspirators, and preclude consumers from being able to choose from high-quality, less-expensive, and more environmentally friendly Competitive Cups.

102.   By entering into horizontal agreements with virtually all of its main Roaster Competitors, Keurig has been able to control output, regulate its customer base, and territorially allocate sales, boycott against Cup Competitors, and otherwise substantially exclude Cup Competitors from meaningfully competing in the Keurig Compatible Cup Market.

103.   By August 2010, due to Keurig's conspiratorial conduct alleged herein, Keurig was listed as number two on Fortune's List of Global 100 Fastest-Growing Companies.  Keurig announced that for "the first nine months of fiscal 2010, the company produced net sales growth of 70% over the prior year and . . . earnings per share growth of 89% over the same period for fiscal year 2009." GMCR Press Release, *Green Mountain Coffee Roasters, Inc. Ranks #2 on Fortune's List of Global 100 Fastest –Growing Companies* (Aug. 19, 2010), http://investorgmcrcom/releasedetailcfm?ReleaseID=500603.

**C.   Keurig Enters Into Exclusionary Deals To Block Cup Competitors From Being Able To Manufacture, Distribute, and Sell Keurig Compatible Cups**

104.   To foreclose potential Cup Competitors from manufacturing, distributing, and selling Competitive Cups, Keurig signed exclusive deals with suppliers of the machinery and components typically used to make Competitive Cups.  These agreements were anticompetitive, as they were intended to restrain and exclude competition from the Keurig Compatible Cup Market.

105.   One of Keurig's agreements with a machine manufacturer restricts that company from selling machinery to Cup Competitors who use such machinery to make Keurig Compatible

Cups.  But this machine manufacturer is permitted to sell the very same machinery for uses other than making Keurig Compatible Cups.

106.     TreeHouse Foods, Inc. ("TreeHouse"), one of only a few Cup Competitors, reports that it attempted to purchase a Spee-Dee Holmatic machine from R.A. Jones & Co. ("R.A. Jones") to manufacture non-filtered Keurig Compatible Cups.  According to TreeHouse, in response to its request, a Sales Manager for R.A. Jones wrote:  "I am quite embarrassed to be writing this email, but it needs to be done. R.A. Jones is declining to quote the new machine for soluble, non-filtered product."  Under "the rules," R.A. Jones had agreed with Keurig that "if the cup goes into a Keurig brewer, [R.A. Jones] cannot quote it."  But, R.A. Jones could still "build equipment for all types of packages, just not K-Cups or anything that goes into a Keurig brewer."

107.     TreeHouse was unable to find another supplier in the United States willing to sell it machinery used to make non-filtered Compatible Cups.

108.     Keurig similarly restrained competition and foreclosed Cup Competitors' access to the components generally used to make Competitive Cups.  Keurig Compatible Cups typically have several components, including a plastic cup, a foil lid, and a filter.  Because Keurig Compatible Cup components must generally be custom-engineered for use in Keurig Single-Serve Brewers, there are very few suppliers of these components.

109.     Upon information and belief, Keurig entered into exclusive dealing agreements with suppliers of Keurig Compatible Cup components, which forced TreeHouse to work with less experienced suppliers at a higher cost to TreeHouse.   This greatly reduced potential Cup Competitors' ability to penetrate and compete in the Relevant Markets, which further inflated the price of Competitive Cups, increased development costs, and eliminated potential Cup Competitors from the Keurig Compatible Cups Market.

110.     Before TreeHouse attempted to enter the Competitive Cups Market, there were three main domestic suppliers of the plastic cups used in K-Cups: Winpak Ltd. ("Winpak"), Phoenix Cups, and Curwood, which at the time collectively accounted for all or nearly all of the market for the sale of components used to manufacture K-Cups.

111.    According to TreeHouse, it approached all three companies (Winpak, Phoenix Cups, and Curwood) when looking for a supplier for components to make Competitive Cups.

112.    At the time, according to TreeHouse, Winpak was already supplying TreeHouse with other types of cups and lids to make products that were not used in Keurig Single-Serve Brewers.  TreeHouse contacted Winpak for cups and lids to make Competitive Cups.  After learning that these components would be used to make Competitive Cups, however, according to TreeHouse, Winpak refused to supply TreeHouse with the components.

113.    According to TreeHouse, it also approached Phoenix Cups about obtaining components for TreeHouse's Competitive Cups.  Although Phoenix Cups had initially begun customizing these components for TreeHouse, it later refused to supply the components because TreeHouse was not an "authorized [Keurig] manufacturer."

114.    And, according to TreeHouse, it also approached Curwood about obtaining components for TreeHouse's Competitive Cups.  But, after learning that the components would be used to make Competitive Cups, Curwood refused to supply TreeHouse with the components due to Curwood's other "obligations."

115.    The Keurig agreements with machine manufacturers and component suppliers restricted the ability of TreeHouse and other Cup Competitors to buy machinery and components necessary to meaningfully compete with Keurig in the Keurig Compatible Cup Market.  Keurig's restrictive practices forced potential Cup Competitors to work with more expensive and less experienced suppliers.  Keurig's restrictive practices raised Cup Competitors' costs, delayed or outright precluded their entry into the market, and greatly reduced their ability to meaningfully compete against Keurig.  There were no pro-competitive justifications for Keurig's exclusive arrangements with machine and component suppliers.

**D.  Keurig Substantially Raised K-Cups Prices Twice in the Middle of an Economic Downturn for a Total of Between 19 percent and 28 percent Without Sustaining any Material Loss of Market Share**

116.    By August 2010, Keurig had become a multi-billion-dollar publicly traded company through its elimination and restriction of competition in the Relevant Markets.  On September 7, 2010, Keurig announced a "price increase" of "approximately 10 to 15 percent" on "all K-Cup Portion Packs for its Keurig Single Cup brewing system sold in North America" that would "occur across all sales channels."

117.    Less than a year later, on June 8, 2011, Keurig announced another price increase of approximately 9-13 percent on all Keurig K-Cups.  Upon information and belief, this price increase did not have a material impact on Keurig's market share in the Keurig Compatible Cup Market.

118.    Prior to 2013, Keurig was able to raise prices for its K-Cups approximately 19-28 percent with little to no material impact on its market share in the Keurig Compatible Cup Market.

119.    These price increases would not have been possible in a competitive market, but they were made possible by the cumulative anticompetitive conduct of Keurig and its co-conspirators, as alleged herein.

120.    Keurig's ability to substantially (and profitably) raise prices without sustaining a material loss in market share further demonstrates Keurig's monopoly power in the Keurig Compatible Cups Markets.

121.    According to Keurig's own statistics, the price of Competitive Cups that typically enter the Keurig Compatible Cups Market cost, on average, 10-25 percent less than the Keurig's K-Cups.  Because Keurig's and its co-conspirators have restrained and excluded Cup Competitors, however, Keurig has been able to maintain supracompetitive pricing even though Competitive Cups obtained 14 percent of the Keurig Compatible Cup Market in 2013.  As Keurig's CEO candidly admitted during the first-quarter earnings call of fiscal year 2014:

We have and you've noticed *we have shifted with the natural win we had a 100% of the system*, and all of a sudden we have 86% of the system something like that. We shifted a little bit from marketing spend against the consumer to trade spend to ensure that we get the consumer trial of the new brands, *particularly as the unlicensed pods came in and remember they came in at mostly 15% to 25% lower prices. And I think you would look and see that we have done while some price reduction, <u>our pricing has held up quite well</u>*.

(Emphasis added.)

122.    Cup Competitor, Rogers Family, reports that its products can cost as much as 58 percent less than the Keurig K-Cups, contain high-quality coffee, and are 97 percent biodegradable.

123.    Further, according to the sworn testimony of a former Keurig K-Cup exclusive distributor, even at the wholesale level, Keurig K-Cups are on average 20 percent more expensive than Competitive Cups.

124.    Keurig and its co-conspirators have substantially restricted and excluded competition from Cup Competitors by virtue of the cumulative anticompetitive conduct alleged herein.  Upon information and belief, but for Keurig's and its co-conspirators' cumulative anticompetitive conduct, Competitive Cups, such as those made by Rogers Family and TreeHouse, would be strong competition to the Keurig K-Cups.

**E.    Keurig Loses Its Patent Cases Against Two Cup Competitors and the Federal Circuit Finds That Keurig Sued To Harm Consumers**

125.    Keurig sought to extend its monopoly by bringing two patent infringement lawsuits against two Keurig Competitive Cup manufacturers, TreeHouse's subsidiary Sturm Foods, Inc. ("Sturm") and Rogers Family, after they began competing against Keurig in the Keurig Compatible Cup Market.

126.    Keurig attempted to shield its market power in the Keurig Compatible Cup Market by using several patents that were set to expire in 2012.  The patents purportedly protected certain aspects of Keurig's brewer technology and the technology necessary to make certain types of filtered Keurig K-Cups.

127.     As early as 2010, some competitors sought to manufacture and market Competitive Cups that did not infringe on Keurig's patents, but Keurig sought to block and delay their entry into the Keurig Compatible Cups Market by using its patents to intimidate competitors and restrain competition.

### (i)     The TreeHouse/Sturm Patent Infringement Case

128.     In 2010, Keurig competitor TreeHouse began making filterless Keurig Compatible Cups.  According to TreeHouse, because Keurig's patents only applied to the use of filters in Keurig Compatible Cups, filterless Keurig Compatible Cups did not infringe on Keurig's patents.

129.     Sturm introduced Keurig Compatible Cups for use in Keurig Single-Serve Brewers in 2010.  The TreeHouse/Sturm Competitive Cups were not sold by Keurig or under a Keurig license.

130.     On October 1, 2010, Keurig sued Sturm in the United States District Court for the District of Delaware ("District Court of Delaware"), claiming that the Competitive Cups infringed on Keurig's utility patents ("*Sturm* case").  But those patents only related to Keurig Single-Serve Brewers and their methods of use and did not cover intellectual property related to Competitive Cups.

131.     In September 2012, the District Court of Delaware granted summary judgment in favor of TreeHouse and Sturm and against Keurig on its patent claims.  Keurig subsequently appealed to the United States Court of Appeals for the Federal Circuit ("Federal Circuit").

132.     On October 17, 2013, the Federal Circuit affirmed the District Court of Delaware's ruling in the *Sturm* case, criticizing Keurig for trying to make an "end-run" around the proper use of the patent laws with "a tactic that the Supreme Court has explicitly admonished."  *Keurig, Inc. v. Sturm Foods, Inc.*, 732 F.3d 1370, 1374 (Fed. Cir. 2013).

133.     As the Federal Circuit expressly found in Keurig's appeal in the *Sturm* case, rather than pursuing any legitimate purpose, "***Keurig is attempting to impermissibly restrict***

***purchasers of Keurig brewers from using non-Keurig [Compatible Cups] by invoking patent law***." *Id.* (Emphasis added.)

### (ii)   The Rogers Family Patent Infringement Case

134.    Keurig competitor Rogers Family began selling Competitive Cups in 2011.  In November 2011, Keurig sued Rogers Family in the United States District Court for the District of Massachusetts ("District Court of Massachusetts").  Keurig claimed that the sale of Rogers Family's Competitive Cups infringed on and induced infringement of the same utility patents that TreeHouse and Sturm had allegedly infringed on.  Keurig also asserted that Rogers Family had infringed on a K-Cups design patent.

135.    In May 2013, the District Court of Massachusetts granted Rogers Family's Motion for Summary Judgment and found that Rogers Family's designs were "sufficiently distinct."  The court also chastised Keurig for "***attempting to institute a postsale restriction that prevents non-Keurig cartridges from being used in Keurig brewers***."  *Keurig, Inc. v JBR, Inc.,* No. 11-11941-FDS, 2013 U.S. Dist. LEXIS 73845, at *35 (D. Mass. May 24, 2013) (emphasis added).  The court further held that "Supreme Court precedent prevents plaintiffs from undertaking such an end run." *Id.*

136.    Keurig appealed to the Federal Circuit the District Court of Massachusetts' decision concerning the design patent.  On March 12, 2014, the Federal Circuit affirmed the District Court of Massachusetts' grant of summary judgment in Rogers Family's favor and denied relief for all of Keurig's claims.

### HORIZONTAL CONSPIRACY TO RESTRAIN AND EXCLUDE COMPETITION AND MAINTAIN AND EXPLOIT SUPRACOMPETITIVE PRICES

**A.    Keurig Conspires with Its Roaster Competitors To Preserve and Expand Keurig's Market Position by Foreclosing Competitors' Access To Roaster Competitors' Products, Business, and Distribution Channels**

137.    Since the 1990s Keurig is and has been in the coffee-roasting and coffee-processing business.  This business involves the acquisition, roasting, and processing of coffee beans and other raw materials for packaging and sale to distributors, wholesalers, and consumers.

The bulk of Keurig's Roaster Competitors, who are in the same coffee-roasting and coffee-processing business, have agreed with Keurig to stay out of the Keurig Compatible Cup Market, except with regard to certain licensing and/or manufacturing agreements they have with Keurig.

138.    Upon information and belief, and as shown by some agreements that have been obtained, as part of their agreements with Keurig, Roaster Competitors agree not to do business with Keurig's Cup Competitors.  These exclusionary agreements and concerted refusals to deal restrain competition by preventing Cup Competitors from: (i) having access to Roaster Competitors' coffee supply for Keurig Compatible Cups; (ii) being able to license the brand rights to sell Keurig Compatible Cups in the name of Roaster Competitors; (iii) being able to enter into manufacturing agreements with Roaster Competitors; and (iv) being able to access the Roaster Competitors' distribution and retail networks.  These agreements, along with the cumulative effects of the other anticompetitive conduct alleged herein, create insurmountable barriers to entry for potential and actual Cup Competitors.

139.    The Keurig agreement with Roaster Competitor Caribou provides insight into these anticompetitive horizontal agreements.  The term of the Caribou agreement is *five years with three three-year automatic renewal periods*, and reads in relevant part:

> 3.2 Supply. Caribou shall sell to GMCR Caribou Coffee, Caribou Tea and Caribou Other Hot Beverage Products for the purpose of the manufacture of Caribou Portion Packs by or for [Keurig].
>
> * * *
>
> 4. Caribou *Portion Pack Exclusivity*. Throughout the world Caribou *shall not directly, or through any Person* in which Caribou directly or indirectly owns an equity interest and, alone or with others, has control of such Person's operations, *sell coffee, Tea or Other Hot Beverage Products to any third party for the specific intended use of producing Keurig Portion Packs or any other product intended for use in the Keurig Brewing System*. In addition, *Caribou shall not license or permit to be licensed to any third party any Caribou Marks for use in connection with coffee products, Tea products or Other Hot Beverage Products, other than Caribou Portion Packs, intended for use with the Keurig Brewing System*.
>
> 5. No Participation in Competing Systems. While this Agreement is in effect, *Caribou shall not directly or indirectly*: (a) install or solicit for installation, *design or solicit for the design*, develop or

> solicit the ***development of any manufacturing line or system to manufacture single-cup, portion-pack cartridges for use in conjunction with a pressurized hot water system other than the Keurig Brewing System***; or (b) ***design, develop, or manufacture, or contribute in any way thereto, any single-cup, portion-pack products, including any brewer designed for use with single-cup, portion pack cartridges other than the Keurig Brewer***….

* * *

> 14 2.3 If at the end of the 54th month of the Initial Term (the "Initial Term Trigger Date"), the volume of Caribou Portion Packs sold [quantity redacted] either Party may terminate this Agreement effective as of the end of the Initial Term by giving notice to the other Party within thirty (30) days of the Initial Term Trigger Date.

> (Emphasis added.)

140.    Upon information and belief, Keurig has entered into similar agreements with most of its major Roaster Competitors to sell their coffee products packaged in Keurig K-Cups. As part of these agreements, if the Roaster Competitor wants its products to be packaged in Keurig K-Cups, it must agree to buy Single-Serve Brewers and Keurig K-Cups only from Keurig and not to purchase Keurig Compatible Cups from Cup Competitors or otherwise do business with Cup Competitors.  These exclusive dealing agreements effectuate both an unlawful concerted refusal to deal (*i.e.*, a group boycott) and an unlawful tying agreement.

141.    According to the United States Supreme Court, such arrangements, as those alleged herein, constitute *per se* violations of antitrust laws.  *See e.g. United States v. Gen. Motors Corp.*, 384 U.S. 127, 148 (1966) (holding that a combination of horizontal and vertical exclusionary agreements designed to exclude competition is a *per se* violation of antitrust laws: "[t]here can be no doubt that the effect of the combination or conspiracy here was to restrain trade and commerce within the meaning of the Sherman Act. Elimination, by joint collaborative action, of discounters from access to the market is a *per se* violation of the Act."); *Klor's Inc. v. Broadway-Hale Stores* (1959) 359 U.S. 207, 212, 7 (finding that a combination of horizontal and vertical exclusionary agreements designed to exclude competition—even from only a single small competitor—constitutes a *per se* violation of antitrust laws, because "[g]roup boycotts, or concerted refusals by traders to deal with other traders, have ***long been held to be in the***

*forbidden category*. They have not been saved by allegations that they were reasonable in the specific circumstances, nor by a failure to show that they 'fixed or regulated prices, parcelled out or limited production, or brought about a deterioration in quality."

142.    As the United States Supreme Court stated in *Northern Pacific Railway Company v. United States*, 356 U.S. 1, 5–6 (1958), "a tying arrangement may be defined as ***an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, <u>or</u> at least agrees that he will not purchase that product from any other supplier***."  (Emphasis added.)  And tying arrangements are illegal *per se* "whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product …."  *Id*.  Keurig's economic power—89 percent in the tying Single-Serve Brewers Market—establishes this *per se* element.

143.    Keurig's unlawful agreements, in conjunction with the cumulative effect of the other anticompetitive conduct alleged herein, which have effectuated a concerted refusal to deal and unlawful tying arrangements, substantially restrain and foreclose competition in the Relevant Markets and enable Keurig and its co-conspirators to maintain supracompetitive prices in the Keurig Compatible Cups Market.

144.    Keurig's conduct consists of two-levels of an unlawful tie, the first of which involves direct contractual relationships and the second involves indirect sales to ultimate consumers.

145.    The first level of the tie involves Keurig's direct contractual tying agreements with distributors and retailers, such as those contracts with office away-from-home distributors (described below), which prevent distributors from being able to purchase high-quality and less-expensive Competitive Cups.   These distributors are not in a position to bargain with Keurig to lower its prices, since Keurig can simply terminate a distributor if it buys Competitive Cups. This is a prospect that most distributors cannot risk in light of the network effects of Keurig's installed base of Single-Serve Brewers combined with Keurig's dominant control over almost every major coffee brand for use in Keurig Compatible Cups.  These tying agreements injure

consumers by facilitating Keurig's goal of maintaining supracompetitive prices for Keurig K-Cups to the ultimate consumers because Competitive Cups are prevented from causing competitive price reductions in the chain of commerce.

146.    The second level of the tie is when the consumer purchases a product from a Distributor or Retailer Competitor, which has signed an exclusive tying agreement with Keurig. Because there is simply no other choice at the point of sale, if the consumer buys a Keurig Single-Serve Brewer from a seller, and wants to be able to use the brewer, the consumer has no choice but to purchase Keurig K-Cups, because nothing else is available from that seller.  This deprives the consumer of the ability to choose from high-quality and less-expensive alternative products at the point of sale.

147.    Also, as discussed below, in some instances, such as with large away-from-home consumers, who typically buy all of their Single-Serve Brewers and Keurig Compatible Cups from a single away-from-home Distributor Competitor, the contractual tie between Keurig and the Distributor Competitor is directly transferred to the ultimate end-user consumer.

148.    Indirect purchasers harmed by concerted refusals to deal or tying arrangements (even if the consumer is not a party to the actual tying agreement) have standing to sue for damages or other monetary relief under state laws that permit indirect-purchaser actions.  *See Sea-Land Service, Inc. v. Atlantic Pacific Int'l, Inc.* 61 F. Supp.2d 1092 (dismissing federal antitrust claims by indirect purchasers under *Illinois Brick* but permitting identical unlawful tying claim to proceed under Hawaii antitrust law patterned after Section 1 in light of state's *Illinois Brick* repealer statute).

**B.    Keurig Conspires with Its Distributor Competitors and Its Retail Competitors To Preserve and Expand Keurig's Market Position by Foreclosing Competitors' Access to Distribution and Retail Channels**

149.    Keurig divides its Keurig K-Cup business into the away-from-home segment and the at-home segment, each described below.

**(i)    The Away-from-Home ("AFH") Consumer Segment**

150.    Keurig manufactures, distributes, and sells Keurig K-Cups that are intended for

non-residential use, which Keurig refers to as the away-from-home segment ("AFH").

**(a)** **The Identity of AFH Consumers Are Readily Ascertainable**

151.    Upon information and belief, the bulk of Keurig Compatible Cups sold in the AFH segment are Keurig K-Cups distributed by a small number of large Distributor Competitors who keep records of how much they pay for Keurig K-Cups, who their AFH customers are, the dates of sale, quantity of sales, and prices paid by consumers for Keurig K-Cups.  Upon information and belief, these third parties have electronic records that make the identity of these consumers readily ascertainable.

152.    Upon information and belief, large AFH consumers typically purchase all of their Single-Serve Brewers and Keurig Compatible Cups from a single supplier, and the vast majority of such suppliers are Distributor Competitors that have entered into exclusive and exclusionary agreements with Keurig.

153.    Upon information and belief, almost all AFH consumers are businesses that generally and regularly keep records of their purchases of Keurig Single-Serve Brewers and Keurig Compatible Cups for warranty or tax purposes.

154.    Upon information and belief, Keurig has in its custody and control the identity and location of all AFH consumers who have registered their warranty for Keurig Single-Serve Brewers.

155.    Upon information and belief, a substantial number of AFH consumers have purchased Keurig K-Cups online from third-party vendors who regularly keep electronic records of who their customers are, the dates of sale, quantity of sales, and prices paid for Keurig K-Cups.

156.    Upon information and belief, a substantial number of AFH consumers have purchased Keurig K-Cups from third-party vendors that utilize membership or reward card numbers and keep regular electronic records of who their customers are, the dates of sale, quantity of sales, and prices paid for Keurig K-Cups.

**(b)** **In the AFH Segment, Keurig Conspires with Its Distributor Competitors and Its Retail Competitors To Preserve and Expand Keurig's Market Position by Foreclosing Competitors' Access to AFH Distribution and Retail Channels**

157. In the AFH segment, many of the distributors and retailers are willing, intentional, and knowing participants ("Distributor Conspirators" or "Retail Conspirators") in the Keurig-led conspiracy to restrain and exclude competition in the Keurig Compatible Cups Market. The conspiracy gives the co-conspirators the ability to sell Keurig K-Cups at supracompetitive prices. This goal is furthered by preserving and expanding Keurig's monopoly control over the Keurig Compatible Cup Market through the exclusion of Competitive Cups from distribution and retail channels.

158. Upon information and belief, Distributor Conspirators conspire directly with Keurig and with each other to keep Competitive Cups out of the distribution and retail channels in the AFH segment. The acts of co-conspirators further the common goal of protecting and extending Keurig's position as a monopolist, market price setter, output setter, and territorial allocator.

159. By threatening to terminate and by actually terminating access to Keurig Single-Serve Brewers and Keurig K-Cups, Keurig uses its monopoly power to intimidate the Distributor and Retail Competitors who do not willingly collude with Keurig to enter into anticompetitive agreements.

160. Keurig also utilizes its market power to prevent Distribution and Retail Conspirators from withdrawing from the conspiracy and from doing business with Cup Competitors by threatening to terminate Distribution Conspirators' access to Keurig Single-Serve Brewers and Keurig K-Cups.

161. Keurig's unlawful agreements and coercions of Distributor and Retail Competitors, along with the other anticompetitive conduct alleged herein, substantially restrained and foreclosed competition in the Relevant Markets.

162.     Upon information and belief, Keurig furthers the conspiracy by entering into exclusive agreements with Distributor and Retail Competitors in the AFH segment.  Roughly 500 Distributor Competitors, of which only a small number controls the bulk of sales, distribute Keurig Single-Serve Brewers and Keurig K-Cups under Keurig Authorized Distributor ("KAD") agreements.

163.     Under KAD agreements, Distributor Competitors distribute Single-Serve Brewers and Keurig K-Cups for commercial, non-residential purposes to work place/office, travel/hospitality, and food-service AFH consumers.

164.     Distributor Competitors who enter into KAD agreements include office-supply distributors and food-service management companies.  Upon information and belief, these particular Distributor Competitors distribute the vast majority of Keurig K-Cups in the AFH segment.

165.     Upon information and belief, these particular Distributor Competitors partner with Keurig to maintain Keurig's supracompetitive prices by excluding Competitive Cups from being sold to their customers.

166.     Upon information and belief, Distributor Competitors enter into multi-year KAD agreements that include exclusive provisions prohibiting the Distributor Competitors from promoting, marketing, selling, or making available any Competitive Cups to their customers.

167.     The Distributor Conspirators and the Distributor Competitors, by virtue of their concerted refusal to deal with Cup Competitors, have formed an effective group boycott of Competitive Cups that has successfully excluded, prevented, and restrained any meaningful competition in the Keurig Compatible Cups Market.

168.     The Distributors Competitors agreed and conspired with Keurig and among themselves to prevent Competitive Cups from meaningfully penetrating the Keurig Compatible Cups Market.  This conduct, in conjunction with the other anticompetitive conduct alleged herein, enables Distributor Competitors to charge supracompetitive prices and prevents non-conspiring Distributor Competitors from having any meaningful access to Competitive Cups.

169.    By virtue of these agreements with Distributor and Retail Competitors, Cup

Competitors are prevented from meaningfully: (i) accessing distribution and retail sales

channels; (ii) achieving economies of scale and efficiencies; (iii) mass producing Competitive

Cups; and (iii) selling Competitive Cups at lower prices.

170.    Upon information and belief, some or all of Keurig's KAD agreements contain

provisions similar to the following three-year agreement:

> GMCR has designed, developed and patented several portion-pack
> beverage brewing systems which consists primarily of using a
> Keurig Brewer (as defined below) in combination with a Keurig
> Pack (as defined below).
>
> GMCR seeks to enter ***into distribution agreements with
> distributors who demonstrate a commitment to focus their
> portion-pack beverage system selling efforts on Keurig Products
> (as defined below) and <u>Keurig Packs within specified territories</u>
> and who meet other criteria established by GMCR***.
>
> GMCR desires to ***appoint Distributor, and Distributor desires to
> accept appointment***, as a nonexclusive ***distributor of Keurig
> Products <u>and</u> Keurig Packs*** upon the terms and conditions
> contained in this Agreement.

*Paragraph 2.1 reads in part:*

> "<u>Keurig Products and Keurig Packs</u>. GMCR hereby appoints
> Distributor and Distributor hereby accepts ***appointment as a non-
> exclusive KAD <u>to purchase and inventory</u> Keurig Products and
> <u>Keurig Packs</u>*** for promotion ***and direct sale***, lease, rent or loan to
> and only to Authorized Locations in the Territory for the exclusive
> use by such Authorized Locations and with respect to Keurig
> Packs, only…."

*Paragraph 3.2 reads:*

> "***<u>Keurig Loyalty</u>***. ***<u>Distributor shall not directly, indirectly or
> through an affiliate promote, market, sell or otherwise make
> available (a) any beverage base or portion pack product, other
> than Keurig Packs, that can be used in a Keurig Brewer</u>***, (b) any
> brewer other than a Keurig Brewer that is intended for use or
> usable with Keurig Packs, or (c) any accessories to Keurig Brewers
> that are not approved by GMCR and are related to the functionality
> of any Keurig Brewer, including without limitation any accessory
> that is intended to replace or allow the re-use of Keurig Packs."

*Paragraph 3.3 reads:*

> <u>Keurig Pack Purchasing</u>. ***Distributor <u>shall order</u> and purchase
> Keurig Packs <u>directly from and only from GMCR</u>***, Licensed

> Partners or KARDs, unless otherwise agreed to in writing by
> GMCR. Nothing shall be construed within this Agreement, implied
> or not, to bind or require Licensed Partners or KARDs to sell
> Keurig Packs to Distributor.

(Emphasis added).

171.    While the agreements feign non-exclusivity by permitting Keurig to essentially do business with whomever it wants, these agreements are fully exclusive as to the distributors.  If a distributor wants to purchase and distribute Keurig Single-Serve Brewers, it must agree to purchase Keurig Compatible Cups from Keurig only and must agree not to do business with Cup Competitors.  Such exclusionary agreements constitute an unlawful tie and a concerted refusal to deal (*i.e.*, a group boycott).

172.    Keurig firmly enforces these agreements.  On March 26, 2012, upon information and belief, Keurig warned Keurig Authorized Distributors ("KADs"): "Any portion pack that you promote, market, sell or otherwise make available that is not made by a Licensed Roaster **subjects you to termination of your Keurig Agreement**."  (Emphasis added.)

173.    The March 26, 2012 warning contained a pretextual justification for the exclusivity provision, claiming that the provisions were necessary "because [Keurig has] not run these portion packs through [its] rigorous testing and approval process [and] [t]herefore, [has] no confidence that these non-licensed portion packs ensure the quality, consistency and safety of [Keurig] brewing systems for . . . mutual end use customers."

174.    This pretextual justification is not supported by the facts.  Upon information and belief, Competitive Cups were available for sale at least two years before Keurig's warning and no colorable safety or quality issues had been identified with respect to their use in Keurig Single-Serve Brewers.  Keurig has neither disclosed to the public any test results that show there were any material quality or safety issues associated with the use of Competitive Cups in Keurig Single-Serve Brewers, nor has it published a testing protocol by which third parties could submit their Competitive Cups made in the United States for actual testing.

175.    Keurig has consistently and unrelentingly continued to enforce its exclusionary agreements.  For example, as recently as February 28, 2014, upon information and belief, one of Keurig's Senior Sales Managers threatened an AFH office distributor, which was considering distributing Competitive Cups, that if it wanted to renew its distributorship with Keurig, the KAD would have to agree to an even stricter contract containing "a pretty detailed loyalty clause that would need to be adhered to as well.  Meaning our KAD's could only sell Keurig/GMCR K-Cups *no rouge packs could be sold or other brewers sold other than Keurig*."  (Emphasis added.)

176.    Upon information and belief, according to this same AFH office distributor, its relationship with Keurig was terminated because, among other things, it refused to agree not to distribute Competitive Cups.  Thus, according to the AFH distributor, it can no longer get parts and service for its installed base of office consumers nor can it purchase new Keurig products at wholesale.  As a result, the AFH office distributor has been unable to obtain new Keurig customers in the single-serve office coffee market and is at substantial risk of losing current customers when their current machines need to be serviced or replaced.

177.    Accordingly, even though the AFH distributor is no longer under its exclusionary contract with Keurig, due to the cumulative effects of Keurig's exclusionary conduct alleged herein, combined with the network effects of Keurig's long-standing market power in the Relevant Markets, the distributor's ability to sell Competitive Cups is greatly inhibited because it will not be able to obtain Keurig Single-Serve Brewers and Keurig K-Cups from Keurig, which are necessary to satisfy its customers, whom have large installed bases of Keurig Single-Serve Brewers.

178.    Upon information and belief, "almost universally," Cup Competitors are told by AFH office distributors that "they are unable to purchase [Competitive Cups] as a result of their Keurig Authorized Dealer ("KAD") agreements with Keurig, which include a 'loyalty provision' that prohibit the promotion, marketing or sale of non-licensed portion packs."

179.    For example, in early 2012, according to Rogers Family's sworn statements, it met with some of the largest office AFH distributors, but Rogers Family was told by each of the

Distributor Competitors that they would not do business with Rogers Family because of the Distributor Competitors' exclusive agreements with Keurig.  As one distributor wrote: "It was very nice meeting with you and learning about [Rogers Family].  Unfortunately *we cannot distribute any other form of kcup according to our contract with Keurig/Green Mountain*." (Emphasis added.)

180.    Keurig's actions constitute overt coercion designed to enforce its exclusive-dealings, group-boycotts, and tying agreements, which are all designed to maintain Keurig's supracompetitive K-Cup prices.

181.    As an AFH office distributor swore under penalty of perjury:

> Keurig uses these KAD agreements to cement its dominant market position in the office coffee services market by forcing vendors to supply only licensed Keurig products, thereby locking customers into the K-Cup ecosystem. Distributors must sign a KAD agreement that includes a "loyalty agreement" that requires the KAD to only sell Keurig-branded or authorized single-serve coffee brewers and compatible portion packs. *These exclusive agreements eliminate any competition from the office coffee distributor market and thus allow Keurig to maintain prices significantly above the prices charged for non-licensed portion packs*....

(Emphasis added.)

**(ii)**    **The At-Home ("AH") Consumer Segment**

    **(a)**    **The Identity AH Consumers Are Readily Ascertainable**

182.    Keurig refers to sales to consumers who consume its products in their residences as the at-home segment ("AH").

183.    Upon information and belief, most AH Keurig K-Cup purchasers also purchase at least one Keurig Single-Serve Brewer for at least $80, and because of the amount of such purchases, many AH consumers keep their receipts, have credit card records, and/or register for their warranty with Keurig.

184.    Upon information and belief, Keurig has in its custody and control the identity and location of all AH consumers who have registered their warranty for Keurig Single-Serve Brewers.

185.     Upon information and belief, a large percentage of Keurig Compatible Cups sold in the AH segment are Keurig K-Cups sold online by third-party vendors, who keep regular electronic records of who their AH customers are, the dates of sale, quantity of sales, and prices paid by AH consumers for Keurig K-Cups.

186.     Upon information and belief, a substantial number of AH consumers have purchased Keurig K-Cups from third-party vendors that utilize membership or reward card numbers and keep regular electronic records of who their customers are, items purchased, the dates of sale, quantity of sales, and prices paid for Keurig K-Cups.

187.     Because Keurig Single-Serve Brewers are not consumables and cost at least $80, most consumers who have purchased or have been given brewers retain possession of them.

188.     Upon information and belief, it is reasonably possible to ascertain through Keurig and other sources the average amount a typical AH consumer spends per year on Keurig K-Cups.

     **(b)**     **In the AH Segment, Keurig Conspires with Its Distributor Competitors and Its Retail Competitors To Preserve and Expand Keurig's Market Position by Foreclosing Competitors' Access to AFH Distribution and Retail Channels**

189.     As is the case with the AFH segment, Keurig enters into exclusive agreements with Distributor and Retail Competitors who sell Keurig K-Cups to AH consumers for use in their residences.

190.     Keurig states: "[w]e promote our AH brewing system which includes portion packs manufactured by the Domestic and Canada segments primarily through specialty and department store retailers, select wholesale clubs, mass merchants, and on our websites."

191.     Keurig partners heavily with one of its Distributor Competitors, M. Block & Sons, Inc. (''MBlock'')—a one-order fulfillment entity—to process the majority of orders sold through Retailer Competitors such as department stores and mass merchants.  As Keurig stated,

> [w]e rely primarily on one fulfillment entity, M. Block & Sons, Inc. (''MBlock''), to process the majority of orders for our AH business sold through to retailers, department stores and mass merchants in the Domestic segment. Our sales processed through

MBlock represented 37%, 38% and 38% of the Company's consolidated net sales for fiscal years 2013, 2012 and 2011, respectively."

192.    Upon information and belief, MBlock keeps detailed electronic records about its customers—their identity, the quantity of Keurig K-Cups they purchased, and the prices they paid for them.

193.    Upon information and belief, AH sellers, some of whom are Distributor and Retailer Conspirators, agreed not to market or sell Competitive Cups or agreed with Keurig to limit the amount of Competitive Cups sold and/or agreed to limit the product placement and geographic location where Competitive Cups are sold.  Distributor and Retail Conspirators, who are AH distributors and/or sellers, are motivated to sell Keurig K-Cups at supracompetitive prices.  This goal is furthered by preserving and expanding Keurig's monopoly control over the Keurig Compatible Cups Market through the exclusion or restraint of Competitive Cups sold in the AH distribution and retail channels.

194.    Upon information and belief, many potential retail customers have informed Rogers Family of the exclusive provisions in their agreements with Keurig and have stated that Keurig has threatened to terminate the customers' access to K-Cup Branded Portion Packs if the potential customers purchase any Competitive Cups.  Rogers Family also reports in public documents that its customers have restricted the geographic locations in which Rogers Family's Competitive Cups can be sold.

195.    Further, according to Rogers Family's statements under penalty of perjury, some of Keurig's Retail Competitors have informed Rogers Family that: "they have exclusive agreements with Keurig that prevent them from doing business with business with Rogers." Specifically, according to Rogers Family, it attempted to sell Competitive Cups to Staples and one of its divisions, but Rogers Family was informed that "although Staples found the coffee to be enjoyable," there was not "much interest due to [Staple's] contractual agreements with [Keurig]," and that Staples is "locked in tight with [Keurig]."  Consumers that purchase a Keurig Single-Serve Brewer from a Retail Competitor, such as Staples, do not realize that they are the

victims of an unlawful tying arrangement and a group boycott.  Keurig obscures this fact from

consumers—creating the illusion of choice—by marketing its Keurig K-Cups through a variety

of well-known brands that consumers do not specifically associate with Keurig, such as

Starbucks, Tully's, Dunkin Donuts, Caribou, Van Houtte, and Newman's Own.  Because each of

these brands is available at Staples, a Staples consumer would not realize that it had no choice

but to buy Keurig K-Cups at the point of sale if it was to purchase a Keurig Single-Serve Brewer

and Keurig Compatible Cups at Staples.

196.    The Distributor and Retailer Conspirators who sell to AH customers, in addition

to the Distributor and Retail Competitors who are coerced into participating in anticompetitive

agreements with Keurig, have organized an effective group boycott that has restrained and

substantially excluded any meaningful competition in the Relevant Markets and, along with the

other anticompetitive conduct alleged herein, has substantially foreclosed competition in the

Relevant Markets all to the detriment of consumers who are forced to pay supracompetitive

prices for Keurig K-Cups while being deprived of the ability to choose from alternatives.

**C.    Keurig Extracts Supracompetitive Prices from Consumers by Locking Them Into Keurig Single-Serve Brewers Through Its Conspiracy To Restrain and Exclude Competition in the Relevant Markets**

197.    Keurig's business plan leverages its Single-Serve Brewer monopoly to foreclose

and hinder competition and extract supracompetitive profits from the Keurig Compatible Cups

Market.  As discussed herein, Keurig uses its market power—at least an 89 percent market

share—in the Keurig Single-Serve Brewers Market to:

> (a)    enhance Keurig K-Cup sales by, among other things, selling Keurig Single-Serve Brewers at cost or at a loss to restrain competition and foreclose other Single-Serve Brewers from meaningfully competing;

> (b)    saturate the market with Keurig Single-Serve Brewers to lock in consumers into purchasing and using only Keurig Compatible Cups, because switching to other Single-Serve Brewers costs in excess of $80 or more, which is sufficiently high to deter switching;

(c)     restrain price and product competition for Keurig Compatible Cups by acquiring or controlling virtually every major Roaster Competitor's popular coffee brands through anticompetitive and conspiratorial licensing and manufacturing agreements;

(d)     restrain price and product competition by entering into unlawful horizontal, exclusive-dealing, and tying arrangements with its Roaster, Distributor, and Retail Competitors to substantially restrain and exclude Competitive Cups from entering the distribution channels; and

(e)     restrain price and product competition through an unlawful concerted refusal to deal (*i.e.*, a group boycott).

198.    The cumulative effects of Keurig's and its co-conspirators' anticompetitive conduct substantially foreclose competition in the Relevant Markets and allows Keurig and its co-conspirators to charge and maintain supracompetitive prices for Keurig K-Cups to the detriment of consumers in every state and territory of the United States.

199.    Keurig's CEO Brian Kelly acknowledged Keurig's plan to maintain and expand its control of the Single-Serve Brewer and Keurig Compatible Cup business by saturating the market with Keurig Single-Serve Brewers in order to drive up sales of its high-priced and highly profitable Keurig K-Cups:

> Our growth strategy involves developing and managing marketing programs to drive Keurig Single Cup brewer adoption in U.S. and Canadian households, food service and office locations in order to generate ongoing demand for portion packs and, in the longer term, globally. ***As part of this strategy, we work to sell our AH brewers at attractive price points which are approximately at cost, or sometimes at a loss*** when factoring in the incremental costs related to sales, ***in order to drive the sales of profitable portion packs***.

> But ***our mission is really simple we want a Keurig on every counter***. We want a Keurig on every counter and every home, we want it in every office, we want it in every restaurant, we want a Keurig on every counter. Once we get a Keurig on every counter we want a beverage for every taste that can go through those Keurig's and that's the simple strategy of the company when you put it on one page.

> (Emphasis added.)

200.    For fiscal year 2013, approximately 92 percent of Keurig's consolidated net sales were attributable to the combination of Keurig K-Cups and Keurig Single-Serve Brewers.  Net sales for fiscal year 2013 totaled $4.358.1 billion, of which $3.187 billion was attributed to the sale of Keurig K-Cup and $827.6 million to the sale of Keurig Single-Serve Brewers.

201.    Upon information and belief, Keurig's earnings and the profit margin on its sales of Keurig K-Cups is significantly higher than the profit margin, if any, obtained through its other operations.  But Keurig is able to more than make up for the lost profits stemming from the sale of Keurig Single-Serve Brewers at cost or at a loss by making as much as a 50 percent profit margin or more on the sale of its Keurig K-Cups.

202.    As Keurig's CEO Brian Kelly recently admitted, Keurig has sold more than 20 billion K-Cups and more than 35 million Keurig Single-Serve Brewers.  Keurig's vast installed base heightens the entry barriers for potential competitors seeking to enter the Single-Serve Brewer Market.  The combined network effect of Keurig's installed base of Single-Serve Brewers and its control over Portion Packs, consisting of almost every major coffee brand available through a wide variety of retail sources, erects insurmountable barriers to entry for any meaningful competition in the Relevant Markets.

203.    Even though a few manufacturers of Competitive Cups have been able to enter the Keurig Compatible Cups Market, the number of Cup Competitors who have entered the market is far lower than it would have been but for Keurig's and its co-conspirators' unlawful activities.  Cup Competitors' ability to increase capacity and bring Competitive Cups to consumers has been limited and restricted by Keurig's anticompetitive exclusive dealing agreements, tying agreements, and concerted refusal to deal that have hampered Cup Competitors' access to machinery to make cups, components to make cups, Roaster Competitors' brands and products, and virtually all of the key distribution and retail channels that can lead to a meaningful number of potential customers.

204.    These agreements are unlawful because they do not serve a pro-competitive purpose, but instead are designed to restrain and exclude competition in the Relevant Markets.

**D.**    **Keurig Announces Lock-Out Technology That Will Prevent Competitive Cups from Working in Keurig Single-Serve Brewers**

205.    As alleged herein, anticipating potential Cup Competitors who might sell high-quality, less-expensive, and more environmentally friendly Competitive Cups, Keurig announced on November 20, 2013, a plan to exclude all competition in the Keurig Compatible Cup Market—the Keurig 2.0 Brewer.  The Keurig 2.0 Brewer will technologically bar Competitive Cups from working in the Keurig 2.0 Brewers.

206.    The Keurig 2.0 Brewer is expected to be released in the fall of 2014, but Keurig and its co-conspirators are already using the November 20, 2013 announcement to further exclude competition with Keurig products.

207.    Rather than "just being another product," the Keurig 2.0 Brewer will replace **all** Keurig Single-Serve Brewers.  Keurig's CEO Brian Kelley admitted that the Keurig 2.0 Brewer "**will replace [Keurig's] current lineup of both K-Cup and Vue brewers**" "over fiscal 2014 and early 2015."  (Emphasis added.)

208.    According to Keurig, "[e]ach Keurig 2.0 brewer will have a camera that can 'read' a proprietary taggant material . . . [that is] embedded on the lid of each Keurig brand pack."

209.    This lock-out technology will allow Keurig to prevent any Competitive Cups from working in the Keurig 2.0 Brewer.  The new Keurig K-Cups and Keurig Compatible Cups, along with the older Competitive Cups, will still work in older Keurig Brewer machines, but the older Competitive Cups will be excluded from the Keurig Compatible Cups Market for use in the Keurig 2.0 Brewers.  Competitive Cups will have virtually no chance of obtaining shelf space next to Keurig 2.0 Brewer products, because retailers will only want Keurig Compatible Cups that will work in the new machines near the new brewers.

210.    For months, Keurig has leaked to the industry that it plans to introduce lock-out technology, and has used these leaks to intimidate distributors and retailers into not carrying

Competitive Cups, which has also discouraged potential Cup Competitors from entering the Keurig Compatible Cup Market.

211.     Upon information and belief, multiple potential customers of Rogers Family and TreeHouse have refused to do business with them because of the threat of the lock-out technology.

212.     Upon information and belief, some distributors and retailers have told Cup Competitors that they will not agree to purchase any more Competitive Cups unless the Competitive Cups will be able to work in the Keurig 2.0 Brewer.  Thus, Keurig's threats have greatly harmed Cup Competitors' good will, ability to compete and grow.  Indeed, if Keurig is able to go to market with its lock-out technology, some Cup Competitors will likely be forced out of business because they will be deprived of shelf space near the new Keurig 2.0 Brewers. This would further reduce competition and further harm consumers.

213.     Upon information and belief, Keurig created the Keurig 2.0 Brewer lock-out technology in order to force all Competitive Cup manufacturers to convert into the Keurig System.  Keurig stated that "*[it] expect[s] to be able to convert a number of unlicensed brands to the Keurig system on a licensed basis*."  (Emphasis added.)

214.     Keurig intends to recapture the entire Keurig Compatible Cup Market by forcing Competitive Cup manufacturers to get licenses from Keurig and forcing more private-label manufacturers to use only Keurig to manufacture their Keurig Compatible Cups.

215.     Upon information and belief, in order to become a licensee and be able to get past the Keurig lock-out technology, Keurig will demand a substantial royalty payment.

216.     There is no pro-competitive benefit to consumers from the Keurig 2.0 Brewer's lock-out technology that would outweigh the massive anticompetitive effects that Keurig's scheme will have in the Relevant Markets.  While Keurig claims to have added new unrelated innovative features to the Keurig 2.0 Brewer, these features do not depend upon the lock-out technology for their functionality and Keurig can disable the lock-out technology before shipping the product without any material effect on the overall functionality of the product.  Thus, the sole

and overriding purpose of the lock-out technology must be to exclude and restrain competition in the Relevant Markets.

**E.    Keurig's Unlawful Conduct Has Harmed and Will Continue To Harm Competition and Consumers**

217.    Keurig's conduct has harmed competition in the Relevant Markets and has caused significant harm to consumers who have been deprived of the opportunity to choose from high-quality, less-expensive, environmentally friendlier alternative Competitive Cups.

218.    The minimal success of Cup Competitors, despite their substantially lower prices (as much as 58 percent lower than Keurig's prices) is quintessential proof that Keurig is grossly overcharging consumers through its anticompetitive conduct and that Keurig's conduct has immunized it from meaningful competitive forces that would determine prices in a truly competitive market.

219.    Keurig's ability to raise prices during an economic downturn without experiencing a material loss to its market share in the Keurig Compatible Cup Market also exemplifies Keurig's monopolistic ability to extract supracompetitive prices from consumers.

220.    Keurig cannot justify its massive price increases on assertions that these are due to increases in commodity prices, because commodity costs are largely insignificant to K-Cup pricing.  As a marketing director for a private-label coffee producer reports, "[c]ommodity costs are pretty irrelevant on the single-cup buyer side. This is not a product type that goes up when coffee costs rise and down when they fall."

221.    Keurig has also harmed consumers by restricting the choice and quality of Competitive Cups available to them.  This lack of choice prevents consumers from being able to choose from Competitive Cups that differ in taste, flavor, biodegradableness, and overall quality from Keurig K-Cups.

222.    For example, as shown below, under its brand name San Francisco Bay Coffee, Rogers Family's Competitive Cups offer consumers the ability to purchase a Keurig Compatible Cup that is *97 percent biodegradable*.  Keurig K-Cups, on the other hand, are *95 percent <u>non-biodegradable</u>*.

**97% Biodegradable Rogers Family Cups**            **95% Non-Biodegradable Keurig K-Cups**

  

223.    Consumers have also been harmed because Keurig's conduct has resulted in its Cup Competitors having fewer resources to meaningfully compete and further innovate and conceive of new and better products.

224.    Keurig's plan for the Keurig 2.0 Brewers has already harmed competition by causing Keurig's Distributor and Retail Competitors to not purchase Competitive Cups and discouraging potential competitors from attempting to penetrate and compete in the Relevant Markets.

## CLASS ALLEGATIONS

225.    Plaintiffs bring this class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2) and (b)(3), on their own behalf and as representatives of the following class of persons and entities (the following classes are collectively referred to as the "Class"):

**A.    Nationwide Class Under the Laws of the State of Vermont for Monetary, Equitable, and Injunctive Relief, and Under Federal Law for Injunctive Relief Only**

226.    In an indirect-purchaser class action antitrust lawsuit, state law may be applied to consumers who purchased products solely in other states so long as the action involves alleged conspiratorial conduct that was sufficiently connected to the state whose law is being applied and the connection is not merely slight and casual.  *AT&T Mobility LLC v. AUO Optronics Corp.*,

707 F.3d 1106, 1113 (9th Cir. 2013) ("*AUO*").  In *AUO*, for example, the Ninth Circuit held that "the Cartwright Act [California's antitrust law] can be lawfully applied without violating a defendant's due process rights when more than a *de minimis* amount of that defendant's alleged conspiratorial activity leading to the sale of price-fixed goods to plaintiffs took place in California."  The *AUO* court held further that "[s]uch . . . defendant cannot reasonably complain that the application of California law is arbitrary or unfair when its alleged conspiracy took place, at least in part, in California." *Id.*

227.     The following "Nationwide Class" is sought to be certified for monetary, equitable, and injunctive relief, under the laws of Vermont.  Vermont law applies because: (i) Keurig is headquartered in Vermont where it planned and orchestrated the nationwide conspiracy alleged herein; thus, a significant amount of the conspiratorial conduct is alleged to have taken place in Vermont; (ii) the conduct emanating from Vermont caused harm to consumers in every state and territory of the United States; (iii) the conspiratorial conduct that took place in Vermont had a substantial effect on trade and commerce in every state and territory of the United States; (iv) by virtue of such conduct, emanating from Vermont, a claim for relief under Vermont's laws exists for all victims of the conspiracy, which violated Vermont law, regardless of where a consumer is a resident or where they purchased the product; and (v) Vermont has a strong interest in enforcing its laws against a Vermont resident, which violated that state's laws to the detriment of the following:

> All persons and entities in the United States and its various territories that indirectly purchased for their own use and not for resale at least one Keurig K-Cup, which was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers, at any time between March 24, 2008 and such time as the anticompetitive effects of Keurig's conduct alleged herein ceases. Excluded from the Class is Keurig and its subsidiaries, parents, affiliates, joint venturers, or co-conspirators, whether or not named as a Defendant in this Complaint, as well as all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and any judge or jurors assigned to this case.

228.    The following "Nationwide Injunctive Class" is sought to be certified for injunctive relief under the federal laws alleged herein:

> All persons and entities in the United States and its various territories that indirectly purchased for their own use and not for resale at least one Keurig K-Cup, which was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers, at any time between March 24, 2010 and such time as the anticompetitive effects of Keurig's conduct alleged herein ceases. Excluded from the Class is Keurig and its subsidiaries, parents, affiliates, joint venturers, or co-conspirators, whether or not named as a Defendant in this Complaint, as well as all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and any judge or jurors assigned to this case.

## B.    State Law Indirect-Purchaser Classes

229.    Plaintiffs also bring this action on their own behalf and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and/or respective state statute(s) on behalf of all members of the following classes (collectively, the "Indirect-Purchaser State Classes") with respect to claims under the antitrust and/or consumer protection statutes of each of those jurisdictions and under common law principles of unjust enrichment where recognized in such jurisdictions at any time between March 24, 2010 and the present. (the "State Law Class Period") (other than for the Vermont Indirect-Purchaser Class whose class period is defined below):

(a)    **Arizona**:  All persons and entities in Arizona that indirectly purchased for their own use and not for resale at least one Keurig K-Cup, which was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers, at any time during the State Law Class Period.  Excluded from the Class is Keurig and its subsidiaries, parents, affiliates, joint venturers, or co-conspirators, whether or not named as a Defendant in this Complaint, as well as all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and any judge or jurors assigned to this case (the "Arizona Indirect-Purchaser Class").

(b)     **California**:  All persons and entities in California that indirectly purchased for their own use and not for resale at least one Keurig K-Cup, which was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers, at any time during the State Law Class Period.  Excluded from the Class is Keurig and its subsidiaries, parents, affiliates, joint venturers, or co-conspirators, whether or not named as a Defendant in this Complaint, as well as all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and any judge or jurors assigned to this case  (the "California Indirect-Purchaser Class").

(c)     **District of Columbia**:  All persons and entities in the District of Columbia that indirectly purchased for their own use and not for resale at least one Keurig K-Cup, which was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers, at any time during the State Law Class Period.  Excluded from the Class is Keurig and its subsidiaries, parents, affiliates, joint venturers, or co-conspirators, whether or not named as a Defendant in this Complaint, as well as all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and any judge or jurors assigned to this case (the "District of Columbia Indirect-Purchaser Class").

(d)     **Florida**:  All persons and entities in Florida that indirectly purchased for their own use and not for resale at least one Keurig K-Cup, which was manufactured or licensed by Keurig, its subsidiaries, affiliates, joint venturers, or joint venturers, at any time during the State Law Class Period.  Excluded from the Class is Keurig and its subsidiaries, parents, affiliates, or co-conspirators, whether or not named as a Defendant in this Complaint, as well as all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and any judge or jurors assigned to this case (the "Florida Indirect-Purchaser Class").

(e)     **<u>Guam</u>**:  All persons and entities in Guam that indirectly purchased for their own use and not for resale at least one Keurig K-Cup, which was manufactured or licensed by Keurig, its subsidiaries, affiliates, joint venturers, or joint venturers, at any time during the State Law Class Period.  Excluded from the Class is Keurig and its subsidiaries, parents, affiliates, or co-conspirators, whether or not named as a Defendant in this Complaint, as well as all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and any judge or jurors assigned to this case (the "Guam Indirect-Purchaser Class").

(f)     **<u>Hawaii</u>**:  All persons and entities in Hawaii that indirectly purchased for their own use and not for resale at least one Keurig K-Cup, which was manufactured or licensed by Keurig, its subsidiaries, affiliates, joint venturers, or joint venturers, at any time during the State Law Class Period.  Excluded from the Class is Keurig and its subsidiaries, parents, affiliates, or co-conspirators, whether or not named as a Defendant in this Complaint, as well as all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and any judge or jurors assigned to this case (the "Hawaii Indirect-Purchaser Class").

(g)     **<u>Illinois</u>**:  All persons and entities in Illinois that indirectly purchased for their own use and not for resale at least one Keurig K-Cup, which was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers, at any time during the State Law Class Period.  Excluded from the Class is Keurig and its subsidiaries, parents, affiliates, joint venturers, or co-conspirators, whether or not named as a Defendant in this Complaint, as well as all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and any judge or jurors assigned to this case (the "Illinois Indirect-Purchaser Class").

(h)    **Iowa**:  All persons and entities in Iowa that indirectly purchased for their own use and not for resale at least one Keurig K-Cup, which was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers, at any time during the State Law Class Period.  Excluded from the Class is Keurig and its subsidiaries, parents, affiliates, joint venturers, or co-conspirators, whether or not named as a Defendant in this Complaint, as well as all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and any judge or jurors assigned to this case (the "Iowa Indirect-Purchaser Class").

(i)    **Kansas**:  All persons and entities in Kansas that indirectly purchased for their own use and not for resale at least one Keurig K-Cup, which was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers, at any time during the State Law Class Period.  Excluded from the Class is Keurig and its subsidiaries, parents, affiliates, joint venturers, or co-conspirators, whether or not named as a Defendant in this Complaint, as well as all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and any judge or jurors assigned to this case (the "Kansas Indirect-Purchaser Class").

(j)    **Maine**:  All persons and entities in Maine that indirectly purchased for their own use and not for resale at least one Keurig K-Cup, which was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers, at any time during the State Law Class Period.  Excluded from the Class is Keurig and its subsidiaries, parents, affiliates, joint venturers, or co-conspirators, whether or not named as a Defendant in this Complaint, as well as all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and any judge or jurors assigned to this case (the "Maine Indirect-Purchaser Class").

(k)     **Massachusetts**:  All persons and entities in Massachusetts that indirectly purchased for their own use and not for resale at least one Keurig K-Cup, which was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers, at any time during the State Law Class Period.  Excluded from the Class is Keurig and its subsidiaries, parents, affiliates, joint venturers, or co-conspirators, whether or not named as a Defendant in this Complaint, as well as all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and any judge or jurors assigned to this case (the "Massachusetts Indirect-Purchaser Class").

(l)     **Michigan**:  All persons and entities in Michigan that indirectly purchased for their own use and not for resale at least one Keurig K-Cup, which was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers, at any time during the State Law Class Period.  Excluded from the Class is Keurig and its subsidiaries, parents, affiliates, joint venturers, or co-conspirators, whether or not named as a Defendant in this Complaint, as well as all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and any judge or jurors assigned to this case (the "Michigan Indirect-Purchaser Class").

(m)    **Minnesota**:  All persons and entities in Minnesota that indirectly purchased for their own use and not for resale at least one Keurig K-Cup, which was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers, at any time during the State Law Class Period.  Excluded from the Class is Keurig and its subsidiaries, parents, affiliates, joint venturers, or co-conspirators, whether or not named as a Defendant in this Complaint, as well as all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and any judge or jurors assigned to this case (the "Minnesota Indirect-Purchaser Class").

(n)     **Mississippi**:  All persons and entities in Mississippi that indirectly purchased for their own use and not for resale at least one Keurig K-Cup, which was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers, at any time during the State Law Class Period.  Excluded from the Class is Keurig and its subsidiaries, parents, affiliates, joint venturers, or co-conspirators, whether or not named as a Defendant in this Complaint, as well as all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and any judge or jurors assigned to this case (the "Mississippi Indirect-Purchaser Class").

(o)     **Montana**:  All persons and entities in Montana that indirectly purchased for their own use and not for resale at least one Keurig K-Cup, which was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers, at any time during the State Law Class Period.  Excluded from the Class is Keurig and its subsidiaries, parents, affiliates, joint venturers, or co-conspirators, whether or not named as a Defendant in this Complaint, as well as all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and any judge or jurors assigned to this case (the "Montana Indirect-Purchaser Class").

(p)     **Nebraska**:  All persons and entities in Nebraska that indirectly purchased for their own use and not for resale at least one Keurig K-Cup, which was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers, at any time during the State Law Class Period.  Excluded from the Class is Keurig and its subsidiaries, parents, affiliates, joint venturers, or co-conspirators, whether or not named as a Defendant in this Complaint, as well as all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and any judge or jurors assigned to this case (the "Nebraska Indirect-Purchaser Class").

(q) **New Hampshire**:  All persons and entities in New Hampshire that indirectly purchased for their own use and not for resale at least one Keurig K-Cup, which was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers, at any time during the State Law Class Period.  Excluded from the Class is Keurig and its subsidiaries, parents, affiliates, joint venturers, or co-conspirators, whether or not named as a Defendant in this Complaint, as well as all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and any judge or jurors assigned to this case (the "New Hampshire Indirect-Purchaser Class").

(r) **Nevada**:  All persons and entities in Nevada that indirectly purchased for their own use and not for resale at least one Keurig K-Cup, which was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers, at any time during the State Law Class Period.  Excluded from the Class is Keurig and its subsidiaries, parents, affiliates, joint venturers, or co-conspirators, whether or not named as a Defendant in this Complaint, as well as all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and any judge or jurors assigned to this case (the "Nevada Indirect-Purchaser Class").

(s) **New Mexico**:  All persons and entities in New Mexico that indirectly purchased for their own use and not for resale at least one K-Cup, which was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers, at any time during the State Law Class Period.  Excluded from the Class is Keurig and its subsidiaries, parents, affiliates, joint venturers, or co-conspirators, whether or not named as a Defendant in this Complaint, as well as all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and any judge or jurors assigned to this case (the "New Mexico Indirect-Purchaser Class").

(t)     **New York**:  All persons and entities in New York that indirectly purchased for their own use and not for resale at least one Keurig K-Cup, which was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers, at any time during the State Law Class Period.  Excluded from the Class is Keurig and its subsidiaries, parents, affiliates, joint venturers, or co-conspirators, whether or not named as a Defendant in this Complaint, as well as all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and any judge or jurors assigned to this case (the "New York Indirect-Purchaser Class").

(u)     **North Carolina**:  All persons and entities in North Carolina that indirectly purchased for their own use and not for resale at least one Keurig K-Cup, which was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers, at any time during the State Law Class Period.  Excluded from the Class is Keurig and its subsidiaries, parents, affiliates, joint venturers, or co-conspirators, whether or not named as a Defendant in this Complaint, as well as all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and any judge or jurors assigned to this case (the "North Carolina Indirect-Purchaser Class").

(v)     **North Dakota**:  All persons and entities in North Dakota that indirectly purchased for their own use and not for resale at least one K-Cup, which was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers, at any time during the State Law Class Period.  Excluded from the Class is Keurig and its subsidiaries, parents, affiliates, joint venturers, or co-conspirators, whether or not named as a Defendant in this Complaint, as well as all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and any judge or jurors assigned to this case (the "North Dakota Indirect-Purchaser Class").

(w)   **Oregon**:  All persons and entities in Oregon that indirectly purchased for their own use and not for resale at least one Keurig K-Cup, which was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers, at any time during the State Law Class Period.  Excluded from the Class is Keurig and its subsidiaries, parents, affiliates, joint venturers, or co-conspirators, whether or not named as a Defendant in this Complaint, as well as all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and any judge or jurors assigned to this case (the "Oregon Indirect-Purchaser Class").

(x)   **South Carolina**:  All persons and entities in South Carolina that indirectly purchased for their own use and not for resale at least one Keurig K-Cup, which was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers, at any time during the State Law Class Period.  Excluded from the Class is Keurig and its subsidiaries, parents, affiliates, joint venturers, or co-conspirators, whether or not named as a Defendant in this Complaint, as well as all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and any judge or jurors assigned to this case (the "South Carolina Indirect-Purchaser Class").

(y)   **South Dakota**:  All persons and entities in South Dakota that indirectly purchased for their own use and not for resale at least one Keurig K-Cup, which was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers, at any time during the State Law Class Period.  Excluded from the Class is Keurig and its subsidiaries, parents, affiliates, joint venturers, or co-conspirators, whether or not named as a Defendant in this Complaint, as well as all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and any judge or jurors assigned to this case (the "South Dakota Indirect-Purchaser Class").

(z)   **Tennessee**:  All persons and entities in Tennessee that indirectly purchased for their own use and not for resale at least one Keurig K-Cup, which was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers, at any time during the State Law Class Period.  Excluded from the Class is Keurig and its subsidiaries, parents, affiliates, joint venturers, or co-conspirators, whether or not named as a Defendant in this Complaint, as well as all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and any judge or jurors assigned to this case (the "Tennessee Indirect-Purchaser Class").

(aa)   **Vermont**:  All persons and entities in Vermont that indirectly purchased for their own use and not for resale at least one Keurig K-Cup, which was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers, at any time between March 24, 2008 and such time as the anticompetitive effects of Keurig's conduct alleged herein ceases.  Excluded from the Class is Keurig and its subsidiaries, parents, affiliates, joint venturers, or co-conspirators, whether or not named as a Defendant in this Complaint, as well as all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and any judge or jurors assigned to this case (the "Vermont Indirect-Purchaser Class").

(bb)   **West Virginia**:  All persons and entities in West Virginia that indirectly purchased for their own use and not for resale at least one Keurig K-Cup, which was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers, at any time during the State Law Class Period.  Excluded from the Class is Keurig and its subsidiaries, parents, affiliates, joint venturers, or co-conspirators, whether or not named as a Defendant in this Complaint, as well as all federal governmental entities and instrumentalities of the federal government,

states and their subdivisions, agencies and instrumentalities, and any judge or
jurors assigned to this case (the "West Virginia Indirect-Purchaser Class").

(cc) **Wisconsin**:  All persons and entities in Wisconsin that indirectly purchased for
their own use and not for resale at least one Keurig K-Cup, which was
manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers,
at any time during the State Law Class Period.  Excluded from the Class is Keurig
and its subsidiaries, parents, affiliates, joint venturers, or co-conspirators, whether
or not named as a Defendant in this Complaint, as well as all federal
governmental entities and instrumentalities of the federal government, states and
their subdivisions, agencies and instrumentalities, and any judge or jurors
assigned to this case (the "Wisconsin Indirect-Purchaser Class").

230.     Following further investigation as well as discovery in the case, definitions of the
Class, including the class periods defined above, may be modified by amendment, and Plaintiffs
reserve the right to join additional class representatives.

231.     The Class is individually so numerous that joinder of all members is
impracticable.  Even though the exact number of members of the Class is unknown at this time,
based on the nature of the trade and commerce involved, Plaintiffs reasonably believe that there
are at least thousands of members in the Class and that their identities can be readily ascertained
from records in the possession of Keurig and third parties.

232.     As detailed in Section B above, Keurig sells its Keurig K-Cups in two segments,
the away-from-home segment and the at-home segment, defined earlier respectively as "AFH"
and "AH."  For the reasons described above and herein, the identities of the Class members who
are consumers in both segments are readily ascertainable by virtue of information in the
possession of Keurig and third parties.

233.     Class members are geographically dispersed throughout the United States and its
territories.

234.     Plaintiffs' claims are typical of the claims of the other members of the Class.

235.     Plaintiffs and the members of the Class have all sustained damages during the Class Period as a result of having purchased one or more Keurig K-Cups indirectly from Keurig at supracompetitive prices.  Keurig and its co-conspirators' anticompetitive conduct alleged herein, the impact of such conduct, and the relief sought are all issues or questions that are common to Plaintiffs and the Class.

236.     Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel competent and experienced in class action and antitrust litigation.  Plaintiffs' interests are coincident with, and not antagonistic to, the interests of the Class.

237.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual Class members.

238.     The questions of law and fact common to the Class include, but are not limited to:

(a)     Whether the Single-Serve Brewer Market is a relevant product market;

(b)     Whether the Keurig Compatible Cup Market is a relevant product market;

(c)     Whether the United States constitutes a relevant geographic market for the Single-Serve Brewer Market and the Keurig Compatible Cups Market;

(d)     Whether Keurig and its alleged horizontal co-conspirators conspired to restrain competition and exclude competitors in the Relevant Markets;

(e)     Whether Keurig entered into unlawful tying agreements in order to force purchasers to agree to purchase Keurig K-Cups or at least agree not to purchase Competitive Cups;

(f)     Whether Keurig and its alleged horizontal co-conspirators entered into a concerted refusal to deal in order to foreclose competition and exclude Cup Competitors from the Keurig Compatible Cup Market;

(g)     Whether Keurig sold Keurig Single-Serve Brewers below cost;

(h)     Whether Keurig possesses monopoly power in the Relevant Markets;

(i)     Whether Keurig combined or conspired with the Roaster Conspirators, Distributor Conspirators, or Retail Conspirators to monopolize the Relevant Markets;

(j)      Whether Keurig combined or horizontally conspired with the Roaster Conspirators, Distributor Conspirators, or Retail Conspirators to fix, raise, maintain, or stabilize the price of Keurig K-Cups or otherwise restrain trade in the United States;

(k)      Whether Keurig violated federal and state antitrust and consumer protection laws;

(l)      Whether the conduct of Keurig and its co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Class;

(m)      The effect of Keurig's and its co-conspirators' conduct on the prices of K-Cups sold in the United States during the Class Period; and

(n)      The appropriate class-wide measure of damages.

239.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members of the Class is impracticable.

240.    The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and the parties, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness. There will be no material difficulty in the management of this action as a class action on behalf of the Class. Though the laws of different states are implicated in this Complaint, these laws are substantially similar to one another and can be grouped together in manageable categories.

### KEURIG'S VIOLATIONS OF LAW AND CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Violation of 9 V.S.A. §§ 2453, 2461, 2465, Vermont Consumer Fraud Act
### (Conspiracy To Monopolize – Group Boycott – Predatory Pricing)

241.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

242.     The Vermont Consumer Fraud Act ("VCFA"), 9 V.S.A. § 2453, *et seq.*, prohibits unfair and deceptive methods of competition in commerce and provides a private remedy for "***any consumer*** who . . . sustains damages or injury as a result of any false or fraudulent representations ***or practices prohibited by . . . this title***."  (Emphasis added.)

243.     Section 2461c(a) of the VCFA provides that: "No person, with the intent to harm competition, shall price goods or services in a manner that tends to create or maintain a monopoly or otherwise harms competition.  A violation of this subsection is deemed to be an unfair method of competition in commerce and a violation of section 2453 of this title."

244.     The VCFA gives any person the right to recover for harm sustained as a result of any violation of the VCFA regardless of whether the person dealt directly with the defendants.

245.     The VCFA does not require that the person bringing the action be a resident of Vermont, nor does it require that the person bringing the action have purchased the product in Vermont.

246.     Keurig is and was a seller, solicitor, or other violator as those terms are used under Vermont law and, by the conduct alleged herein, intended to harm competition in the Relevant Markets.

247.     Plaintiffs and the Class purchased products that were priced by Keurig and its co-conspirators in a manner that tended to create or maintain Keurig's monopoly over the Relevant Markets and otherwise harmed competition in the Relevant Markets.

248.     Plaintiffs and the Class were subjected to supracompetitive pricing while unaware that Keurig and its co-conspirators had restrained, and further threatened to restrain, competition in the Relevant Markets by:

(a)     conspiring to eliminate actual and potential competition through anticompetitive agreements with its Roaster Competitors;

(b)     conspiring to eliminate actual and potential competition through anticompetitive agreements with its Distributor Competitors;

(c)     conspiring to eliminate actual and potential competition through anticompetitive agreements with its Retail Competitors;

(d)     conspiring to enter into long-term exclusive contracts with manufacturers of machines used to make Keurig Compatible Cups and component suppliers for Keurig Compatible Cups that denied Cup Competitors access to equipment and materials needed to compete with Keurig;

(e)     conspiring to enter into, and entering into, unlawful agreements that effectuated an unlawful group boycott of Competitive Cups; and

(f)     conspiring to tie sales of Keurig Single-Serve Brewers to sales of Keurig K-Cups for the purpose of excluding competition in the Relevant Markets.

249.    By virtue of the conduct alleged herein, Keurig and its co-conspirators entered into contracts where the effect of such contract was to substantially lessen competition or tended to create a monopoly in a line of trade or commerce in Vermont in violation of section 2453, *et. seq.*, of Vermont Title 9.

250.    Keurig's contract, combination, trust or conspiracy with its co-conspirators was centered in, carried out, and effectuated and perfected substantially within the state of Vermont. Specifically, Keurig formulated in Vermont its pricing practices designed to harm competition, and this conduct injured all members of the Class in every state and territory of the United States. This claim for relief under Vermont law is brought on behalf of all members of the Nationwide Class, whether or not they are Vermont residents and whether or not the purchase was made in Vermont. Alternatively, this claim for relief is brought on behalf of only the Vermont Indirect-Purchaser Class.

251.    As a direct and proximate result of Keurig's unlawful conduct, Plaintiffs and the members of the Nationwide Class and the Vermont Indirect-Purchaser Class have been injured in their business and property by paying more for Keurig's K-Cups than they otherwise would have paid but for Keurig's unlawful conduct. As a result of Keurig's violation of Section 2453, *et seq.*, of Vermont Title 9, Plaintiffs and the Class seek the consideration or the value thereof

given by the Class for Keurig K-Cups (or damages in the alternative), and exemplary damages not exceeding three times the value of the consideration given by the Class for Keurig K-Cups, as well as the costs of suit, including reasonable attorneys' fees, pursuant to Section 2465 of Vermont Title 9.

## SECOND CLAIM FOR RELIEF
### Violation of 9 V.S.A. §§ 2453, 2461, 2465, Vermont Consumer Fraud Act
### (Unlawful Tying Under Vermont Law)

252.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

253.     A tying arrangement that satisfies the test articulated by the Supreme Court in *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 5 (1958) constitutes a violation of the VCFA.  *Vermont Mobile Home Owners' Ass'n, Inc. v. Lapierre*, (D. Vt. 2000) 94 F.Supp.2d 519, 523-25 (citing *Yentsch v. Texaco, Inc.,* 630 F.2d 46, 56–57 (2d Cir.1980)).  According to United States Supreme Court in *Northern Pacific Railway*, "a tying arrangement may be defined as ***an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, <u>or</u> at least agrees that he will not purchase that product from any other supplier*.*"  Id.* (Emphasis added.)

254.     Keurig Single-Serve Brewers (tying products) and Keurig K-Cups (tied products) are separate and distinct products.

255.     Keurig coerced buyers of Keurig Single-Serve Brewers into accepting Keurig K-Cups or at least into agreeing not to purchase Competitive Cups.

256.     Keurig has and had sufficient economic power in the Keurig Single-Serve Brewers market to coerce Keurig Single-Serve Brewer purchasers' acceptance of Keurig K-Cups.

257.     Keurig's conduct has and had anticompetitive effects in the Keurig Compatible Cups Market.

258.     Keurig's conduct involved a "not insubstantial" amount of interstate commerce in the Keurig Compatible Cups Market.

259.     Plaintiffs and the Class have been and will continue to be harmed by the conduct alleged herein because Keurig's conduct has and will continue to force consumers to pay supracompetitive prices for Keurig Compatible Cups and/or Keurig K-Cups and has foreclosed and will continue to foreclose consumers from being able to choose from alternatively less expensive, environmentally friendlier, and high-quality Competitive Cups.

260.     Keurig's and its co-conspirators' conduct was a substantial factor in causing Plaintiffs' and the Class's harm.

261.     Keurig's conduct alleged herein injured all members of the Class in every state and territory of the United States.  Therefore, this claim for relief under Vermont law is brought on behalf of all members of the Nationwide Class, whether or not they are Vermont residents and whether or not they purchased their product in Vermont.  Alternatively, this claim for relief is brought on behalf of only the Vermont Indirect-Purchaser Class.

262.     As a direct and proximate result of Keurig's unlawful conduct, Plaintiffs and the members of the Nationwide Class and the Vermont Indirect-Purchaser Class have been injured in their business and property by paying more for Keurig's K-Cups than they otherwise would have paid but for Keurig's unlawful conduct.  As a result of Keurig's violation of Section 2453, *et seq.*, of Vermont Title 9, Plaintiffs and the Class seek the consideration or the value thereof given by the Class for Keurig K-Cups (or damages in the alternative), and exemplary damages not exceeding three times the value of the consideration given by the Class for Keurig K-Cups, as well as the costs of suit, including reasonable attorneys' fees, pursuant to Section 2465 of Vermont Title 9.

### THIRD CLAIM FOR RELIEF
### (Unjust Enrichment Under Vermont Law)

263.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

264.     By virtue of the sale of Keurig K-Cups to Plaintiffs and the Class, a benefit was conferred on Keurig.

265.    Keurig accepted the benefit.

266.    Keurig retained the benefit under such circumstances that it would be inequitable for Keurig not to compensate Plaintiffs and the Class for the benefit conferred on Keurig.

267.    Plaintiffs and the Class therefore seek a constructive trust and or disgorgement of all monies conferred on Keurig as a result of Keurig K-Cup purchases made by Plaintiffs and the Class.

268.    Keurig received and accepted a benefit from all members of the Class in every state and territory of the United States.  Therefore, this claim for relief under Vermont law is brought on behalf of all members of the Nationwide Class, whether or not they are Vermont residents and whether or not they purchased their product in Vermont.  Alternatively, this claim for relief is brought on behalf of only the Vermont Indirect-Purchaser Class.

**FOURTH CLAIM FOR RELIEF**
**Violation of §§ 16700 et seq. & 16720 of California Business and Professions Code ("Cartwright Act")**
**(Conspiracy to Monopolize and Restrain Trade - Group Boycott)**

269.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

270.    Keurig and its co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce as alleged herein in violation of Section 16720, *et seq*. of the California Business and Professional Code.  In order to maintain the price of Keurig Compatible Cups at supracompetitive levels at the Plaintiffs' and the Class's expense, Keurig has combined and conspired in violation of §16720 to monopolize the markets for Single-Serve Brewers and Keurig Compatible Cups.

271.    Keurig's anticompetitive conduct was knowing and willful and constitutes a flagrant violation of California Business and Professions Code §§16700 *et seq*.

272.    Keurig and its co-conspirators have restrained and further threaten to restrain competition in the Relevant Markets by:

(a)     conspiring to eliminate actual and potential competition through anticompetitive agreements with its Roaster Competitors;

(b)     conspiring to eliminate actual and potential competition through anticompetitive agreements with its Distributor Competitors;

(c)     conspiring to eliminate actual and potential competition through anticompetitive agreements with its Retail Competitors;

(d)     conspiring to enter into long-term exclusive contracts with manufacturers of machines used to make Keurig Compatible Cups and component suppliers for Keurig Compatible Cups that denied Cup Competitors access to equipment and materials needed to compete with Keurig;

(e)     conspiring to enter, and entering into, unlawful agreements that effectuated an unlawful group boycott of Competitive Cups; and

(f)     conspiring to tie sales of Keurig Single-Serve Brewers to sales of Keurig K-Cups for the purpose of excluding competition in the Relevant Markets.

273.     By virtue of the conduct alleged herein, Keurig and its co-conspirators entered into contracts where the effect of such contract was to substantially lessen competition or tended to create a monopoly in a line of trade or commerce in California in violation of Section 16720, *et seq.* of the California Business and Professional Code.

274.     As a direct and proximate result of Keurig's unlawful conduct, Plaintiffs and the members of the California Indirect-Purchaser Class have been injured in their business and property by paying more for Keurig's K-Cups than they otherwise would have paid but for Keurig's unlawful conduct.  As a result of Defendant's violation of Section 16720, *et seq.*, of the California Business and Professions Code, Plaintiffs and the Class seek treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

275.     This claim for relief is brought on behalf of only the California Indirect-Purchaser Class.

## FIFTH CLAIM FOR RELIEF
### Violation of §§ 16720 & 16727 of California Business and Professions Code
### (Unlawful Tying Under California Law)

276.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

277.    Keurig Single-Serve Brewers (tying products) and Keurig K-Cups (tied products) are separate and distinct products.

278.    Keurig and its co-conspirators sell Keurig Single-Serve Brewers only if the buyers also purchase Keurig K-Cups and/or agree not to purchase Competitive Cups.  Keurig and its co-conspirators sold Keurig Single-Serve Brewers and required or otherwise coerced buyers into also purchasing Keurig K-Cups and/or agreeing not to purchase Competitive Cups.

279.    Keurig and its co-conspirators have market power in the Keurig Single-Serve Brewers Market, which enables them to leverage and impose an appreciable restraint on competition for Keurig Compatible Cups by coercing customers into buying Keurig K-Cups and thereby significantly reducing the volume of sales of Competitive Cups.  Keurig and its co-conspirators have sufficient economic power in the market for Keurig Single-Serve Brewers to coerce consumers into purchasing Keurig K-Cups.  The tying arrangements have restrained competition for a substantial amount of sales, in terms of total dollar volume, of Competitive Cups.

280.    Plaintiffs and the Class have been and will continue to be harmed by the conduct alleged herein because Defendant's conduct has and will continue to force consumers to pay supracompetitive prices for Keurig Compatible Cups and/or Keurig K-Cups and has foreclosed and will continue to foreclose consumers from being able to choose from alternative less-expensive, environmentally-friendlier, and high-quality Competitive Cups.

281.    Keurig's and its co-conspirators' conduct was a substantial factor in causing Plaintiffs' and the Class's harm.

282.    As a direct and proximate result of Keurig's unlawful conduct, Plaintiffs and the members of the California Indirect-Purchaser Class have been injured in their business and

property by paying more for Keurig's K-Cups than they otherwise would have paid but for Keurig's unlawful conduct.  As a result of Defendant's violation of Section 16720, *et seq.*, of the California Business and Professions Code, Plaintiffs and the Class seek treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

283.    This claim for relief is brought on behalf of only the California Indirect-Purchaser Class.

### SIXTH CLAIM FOR RELIEF
### Violation of § 17043 of the California Business and Professions Code
### (Below-Cost Sales)

284.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

285.    Keurig admits in its most recent annual report that:

> Our growth strategy involves developing and managing marketing programs to drive Keurig Single Cup brewer adoption in U.S. and Canadian households, food service and office locations in order to generate ongoing demand for portion packs and, in the longer term, globally. As part of this strategy, we work to sell our AH brewers at attractive price points which are approximately at cost, *or sometimes at a loss when factoring in the incremental costs related to sales, in order to drive the sales of profitable portion packs*.

> (Emphasis added.)

286.    Keurig and its co-conspirators sold Keurig Single-Serve Brewers below cost.

287.    Keurig and its co-conspirators gave away Keurig Single-Serve Brewers.

288.    Keurig and its co-conspirators sold Keurig Single-Serve Brewers below cost or gave away Keurig Single-Serve Brewers for the purpose of injuring competitors or harming and destroying competition.

289.    Plaintiffs and the Class were harmed by having to purchase Keurig K-Cups at supracompetitive prices.

290.    Keurig's and its co-conspirators' conduct was a substantial factor in causing Plaintiffs' and the Class's harm.

291.     As a direct and proximate result of Keurig's unlawful conduct, Plaintiffs and the members of the California Indirect-Purchaser Class have been injured in their business and property by paying more for Keurig's K-Cups than they otherwise would have paid but for Keurig's unlawful conduct.  As a result of Defendant's violation of Section 16720, *et seq.*, of the California Business and Professions Code, Plaintiffs and the Class seek treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

292.     This claim for relief is brought on behalf of only the California Indirect-Purchaser Class.

**SEVENTH CLAIM FOR RELIEF**
**Violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2**
**(Conspiracy to Monopolize and Restrain Trade - Group Boycott)**

293.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

294.     Keurig and its co-conspirators have conspired to restrain and harm competition in the Relevant Markets by:

(a)     conspiring to eliminate actual and potential competition through anticompetitive agreements with its Roaster Competitors;

(b)     conspiring to eliminate actual and potential competition through anticompetitive agreements with its Distributor Competitors;

(c)     conspiring to eliminate actual and potential competition through anticompetitive agreements with its Retail Competitors;

(d)     conspiring to enter into long-term exclusive contracts with manufacturers of machines used to make Keurig Compatible Cups and component suppliers for Keurig Compatible Cups that denied Cup Competitors access to equipment and materials needed to compete with Keurig;

(e)     conspiring to enter into, and entering into, unlawful agreements that effectuated an unlawful group boycott of Competitive Cups; and

(f)      conspiring to tie sales of Keurig Single-Serve Brewers to sales of Keurig K-Cups for the purpose of excluding competition in the Relevant Markets.

295.    As a direct and proximate result of Keurig's unlawful conduct, Plaintiffs and the members of the Nationwide Class have been injured in their business and property by paying more for Keurig's K-Cups than they otherwise would have paid but for Keurig's unlawful conduct.  As a result of Defendant's violation, Plaintiffs seek injunctive relief and attorneys' fees.

**EIGHTH CLAIM FOR RELIEF**
**Violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§1, 2,**
**and Section 3 of the Clayton Act, 15 U.S.C. § 14**
**(Exclusive Dealing)**

296.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

297.    Keurig has monopoly power in the Single-Serve Brewer Market and the Keurig Compatible Cup Market, including the power to control prices and exclude competition.

298.    Keurig has willfully and intentionally entered into anticompetitive, exclusionary agreements with machine suppliers, component suppliers, hot-beverage competitors (including Roaster Conspirators), and distributors and retailers (including Distributor and Retail Conspirators).

299.    These exclusive agreements are unreasonably and unnecessarily restrictive in terms of scope, duration, and market coverage.

300.    The agreements cannot be justified by any pro-competitive purpose.  Thus, the exclusive dealing agreements are not only unduly restrictive and unreasonable in duration, but also serve the anticompetitive purpose of cutting Cup Competitors off from resources needed to compete with Keurig.

301.    These exclusionary agreements violate Sections 1 and 2 of the Sherman Act, because the agreements and conspiracies involved two or more unaffiliated entities and were entered into in order to preserve and expand Keurig's monopoly control over the Single-Serve

Brewer Market and the Keurig Compatible Cup Market and to maintain or establish unlawful supracompetitive prices.

302.     As a direct and proximate result of Keurig's anticompetitive conduct, Plaintiffs and members of the class have been injured in their business or property by Keurig's exclusive dealing agreements. Plaintiffs and the other members of the Class have been forced to pay supracompetitive prices for Keurig's K-Cups.  Cup Competitors' output and access to markets has been reduced and their prices artificially increased, thereby reducing and blocking consumers' access to lower-priced, high-quality, and/or greener alternative products.

303.     As a direct and proximate result of Keurig's unlawful conduct, Plaintiffs and the members of the Nationwide Injunctive Class have been injured in their business and property by paying more for Keurig's K-Cups than they otherwise would have paid but for Keurig's unlawful conduct.  As a result of Defendant's violation, Plaintiffs seek injunctive relief, and costs of suit, including attorneys' fees.

## NINTH CLAIM FOR RELIEF
### (Violation of State Antitrust and Unfair Competition Laws)

304.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

305.     By virtue of the fact, among other things, that Keurig K-Cups are distributed and sold in each of the below jurisdictions by at least one of the Roaster Conspirators, Distribution Conspirators, or Retail Conspirators, Keurig and at least one of the co-conspirators entered into unlawful agreements in each of the below jurisdictions.

306.     Plaintiffs and the Class were injured as a result of a contract, combination or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce, a part of which occurred within each of the following jurisdictions, and was unlawful under such laws follows:

307.    By reason of the foregoing, and the fact that competition in the Relevant Markets was restrained, suppressed, and eliminated throughout Arizona, Keurig has entered into agreements in restraint of trade in violation of Arizona Revised Stat. §§44-1401, *et seq.*

308.    By reason of the foregoing, and the fact that competition in the Relevant Markets was restrained, suppressed, and eliminated throughout California, Keurig has entered into agreements in restraint of trade in violation of California Bus.  & Prof. Code §§ 16700, *et seq.* and California's Unfair Competition Law, Cal. Bus. & Prof. Code §§17200, *et seq.*

309.    By reason of the foregoing, and the fact that competition in the Relevant Markets was restrained, suppressed, and eliminated throughout the District of Columbia, Keurig has entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§28-4501, *et seq.*

310.    By reason of the foregoing, and the fact that competition in the Relevant Markets was restrained, suppressed, and eliminated throughout Guam, Keurig has entered into agreements in restraint of trade in violation of the Guam Code 9 G.C.A §§69.10, *et seq.*

311.    By reason of the foregoing, and the fact that competition in the Relevant Markets was restrained, suppressed, and eliminated throughout Iowa, and the fact that competition in the Relevant Markets was restrained, suppressed, and eliminated throughout Iowa, Keurig has entered into agreements in restraint of trade in violation of Iowa Code §§553.1, *et seq.*

312.    By reason of the foregoing, and the fact that competition in the Relevant Markets was restrained, suppressed, and eliminated throughout Kansas, Keurig has entered into a trust that is a combination of capital, skill, or acts, by two or more persons to, among other things, fix a standard or figure, whereby the price of Keurig K-Cups to the public was controlled or established, and was an article or commodity of merchandise, produce or commerce intended for sale, use or consumption in Kansas in violation of Kansas Stat. Ann. §§50-101, *et seq.*

313.    By reason of the foregoing, and the fact that competition in the Relevant Markets was restrained, suppressed, and eliminated throughout Maine, Keurig has entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§1101, *et seq.*

314.    By reason of the foregoing, and the fact that competition in the Relevant Markets was restrained, suppressed, and eliminated throughout Michigan, Keurig has entered into agreements in restraint of trade in violation of Michigan Comp. Laws. Ann. §§445.773, *et seq*.

315.    By reason of the foregoing, and the fact that competition in the Relevant Markets was restrained, suppressed, and eliminated throughout Minnesota, Keurig has entered into agreements in restraint of trade in violation of Minnesota Stat. §§325D.49, *et seq*.

316.    By reason of the foregoing, and the fact that competition in the Relevant Markets was restrained, suppressed, and eliminated throughout Mississippi, Keurig has entered into agreements in restraint of trade in violation of Mississippi Code Ann. §75-21-1, *et seq*.

317.    By reason of the foregoing, and the fact that competition in the Relevant Markets was restrained, suppressed, and eliminated throughout Nebraska, Keurig has entered into agreements in restraint of trade in violation of Nebraska Rev. Stat. §§59-801, *et seq*.

318.    By reason of the foregoing, and the fact that competition in the Relevant Markets was restrained, suppressed, and eliminated throughout Nevada, Keurig has entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§598A.010, *et seq*.

319.    296.    By reason of the foregoing, and the fact that competition in the Relevant Markets was restrained, suppressed, and eliminated throughout New Hampshire, Keurig has entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes §§356:1, *et seq*.

320.    By reason of the foregoing, and the fact that competition in the Relevant Markets was restrained, suppressed, and eliminated throughout New Mexico, Keurig has entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§57-1-1, *et seq*.

321.    By reason of the foregoing, and the fact that competition in the Relevant Markets was restrained, suppressed, and eliminated throughout New York, Keurig has entered into agreements in restraint of trade in violation of New York Gen. Bus. Law §340, *et seq*.

322.    By reason of the foregoing, and the fact that competition in the Relevant Markets was restrained, suppressed, and eliminated throughout North Carolina, Keurig has entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §75-1, *et seq.*

323.    By reason of the foregoing, and the fact that competition in the Relevant Markets was restrained, suppressed, and eliminated throughout North Dakota, Keurig has entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§51-08.1-01, *et seq.*

324.    By reason of the foregoing, and the fact that competition in the Relevant Markets was restrained, suppressed, and eliminated throughout Oregon, Keurig has entered into agreements in restraint of trade in violation of the Oregon Revised Statutes §§646.705, *et seq.*

325.    By reason of the foregoing, and the fact that competition in the Relevant Markets was restrained, suppressed, and eliminated throughout South Dakota, Keurig has entered into agreements in restraint of trade in violation of South Dakota Codified Laws §§37-1-1, *et seq.*

326.    By reason of the foregoing, Keurig has entered into arrangements, contracts, agreements, trusts, or combinations with persons or corporations made with a view to lessen, or which tend to lessen, full and free competition in the importation or sale of articles imported into Tennessee; competition in the Relevant Markets was restrained, suppressed, and eliminated throughout Tennessee; and Keurig has otherwise entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§47-25-101, *et seq.*

327.    By reason of the foregoing, Keurig has entered into agreements in restraint of trade in violation of Vermont Stat. Ann. 9 §§2451, *et seq.*

328.    By reason of the foregoing, and the fact that competition in the Relevant Markets was restrained, suppressed, and eliminated throughout West Virginia, Keurig has entered into agreements in restraint of trade in violation of West Virginia §§47-18-1, *et seq.*

329.    By reason of the foregoing, Keurig has entered into agreements in restraint of trade in violation of Wisconsin Stat. §§133.01, *et seq.*

330.    Class Members in each of the states listed above paid supracompetitive, artificially-inflated prices for Keurig K-Cups. As a direct and proximate result of Keurig's

unlawful conduct, such members of the Class have been injured in their business and property by paying more for K-Cups than they otherwise would have paid but for Keurig's unlawful conduct.

331.    As a result of Keurig's violations of the statutes set forth above, Class members seek damages and costs of suit, including reasonable attorneys' fees.

### TENTH CLAIM FOR RELIEF
### (Violation of State Consumer Protection Laws & Unfair Trade Practices)

332.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

333.    By virtue of the fact, among other things, that Keurig K-Cups are distributed and sold in each of the below jurisdictions by at least one of the Roaster Conspirators, Distribution Conspirators, or Retail Conspirators, Keurig and at least one of the co-conspirators entered into unlawful agreements in each of the below jurisdictions.

334.    Plaintiffs and the Class were injured as a result of Keurig's unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below, unless a particular state law claim is expressly modified or limited:

335.    Keurig has engaged in unfair competition or unfair or deceptive acts or practices in violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §17200, *et seq*.

336.    Keurig has engaged in unfair competition or unfair or deceptive acts or practices in violation of the District of Columbia Consumer Protection Act, 28-3901 *et seq*.

337.    Keurig has engaged in unfair competition or unconscionable, unfair or deceptive acts or practices in violation of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. §501.201, *et seq*.

338.    Keurig has engaged in unfair and deceptive acts or practices in violation of Hawaii Rev. Stat. §480-2, *et seq*.  This claim for relief under Hawaii law only preliminarily disavows a claim of unfair competition under Section 480-2, *et seq*.  Plaintiffs, however, reserve the right to amend this Complaint to add a claim for violations of Hawaii's antitrust and unfair

competition laws following notice to Hawaii's Attorney General pursuant to that state's notice requirements.

339.    Keurig has engaged in unfair competition or unfair or deceptive acts or practices in violation of Maine Rev. Stat. Ann, 5 §§205-A, *et seq.*

340.    Keurig has engaged in unfair competition or unfair or deceptive acts or practices in violation of Massachusetts's Regulation of Business Practice and Consumer Protection Act, Mass. Gen. Laws, Ch. 93A, §1, *et seq.*

341.    Keurig has engaged in unfair competition or unfair or deceptive acts or practices in violation of Minnesota Stat. §§8.31, *et seq.*

342.    Keurig has engaged in unfair competition or unfair or deceptive acts or practices in violation of Montana's Unfair Trade Practices and Consumer Protection Act, Mont. Code §30-14-201, *et seq.*

343.    Keurig has engaged in unfair competition or unfair or deceptive acts or practices in violation of Nebraska's Consumer Protection Act, Neb. Rev. Stat. §59-1601, *et seq.*

344.    Keurig has engaged in unfair competition or unfair or deceptive acts or practices in violation of Consumer Protection Act (CPA), see generally New Hampshire Statute RSA chapter 358–A:1, *et seq.*

345.    Keurig has engaged in unfair competition or unfair or deceptive acts or practices in violation of New York's General Business Laws, N.Y. Gen. Bus. Law §349, *et seq.* Specifically:

(a)    Keurig engaged in commerce in New York;

(b)    Keurig, with assistance from its co-conspirators, conspired to monopolize the Single-Serve Brewers Market and the Keurig Compatible Cups Market;

(c)    New York consumers were targets of the conspiracy;

(d)    The secret agreements were not known to New York consumers;

(e)    Because of Keurig's unlawful trade practices in the State of New York, there was a broad impact on the New York Indirect-Purchaser Class who indirectly

purchased K-Cups; and the New York Indirect-Purchaser Class have been injured because they have paid more for Keurig K-Cups than they would have paid in the absence of Keurig's unlawful trade acts and practices;

(f)     Because of Keurig's unlawful trade practices in the State of New York, New York Indirect-Purchaser Class who indirectly purchased K-Cups were misled into believing that they were paying a fair price for Keurig K-Cups or that the price increases for Keurig K-Cups were for valid business reasons; and similarly situated consumers were potentially affected by Keurig's conduct;

(g)     Keurig knew that its unlawful trade practices with respect to its conspiracy to monopolize the Keurig Compatible Cup Market would have an impact on the New York Indirect-Purchaser Class and not just Keurig's direct customers;

(h)     Keurig knew that their unlawful trade practices with respect to its conspiracy to monopolize the Keurig Compatible Cup Market would have a broad impact, causing New York Indirect-Purchaser Class who indirectly purchased Keurig K-Cups to be injured by paying more for Keurig K-Cups than they would have paid but for Keurig's unlawful trade acts and practices; and

(i)     Keurig's consumer-oriented violations adversely affected the public interest in the State of New York.

346.     Keurig has engaged in unfair competition or unfair or deceptive acts or practices in violation of South Carolina's Unfair Trade Practices Act, S.C. Code Ann. §39-5-10, *et seq*.

347.     Keurig has engaged in unfair competition or unfair or deceptive acts or practices in violation of Vermont's Consumer Fraud Act, 9 Vt. Stat. Ann §2451, *et seq.*

**ELEVENTH CLAIM FOR RELIEF**
**(State Common Law Unjust Enrichment and Disgorgement)**

348.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

349.    Keurig has been unjustly enriched through overpayments by Plaintiffs and the Class and through the resulting profits enjoyed by Defendants as a direct result of such overpayments.

350.    Plaintiffs' and the Class's detriment and Keurig's enrichment were related to and flowed from the conduct challenged in this Complaint.

351.    Keurig has been enriched and Plaintiffs have been impoverished as a result of Keurig's enrichment.

352.    Keurig benefited, appreciated the benefit, and accepted the benefit conveyed upon it by Plaintiffs as a result of the conduct alleged herein.

353.    Keurig's enrichment was unjustified.

354.    Keurig's retention of the benefit violates fundamental principles of justice, equity, and good conscience.

355.    Under common law principles of unjust enrichment, and under the circumstances alleged herein, it would be inequitable for Keurig not to compensate Plaintiffs and the Class for the benefit conferred on Keurig and Keurig should not be permitted to retain the benefits conferred via overpayments by Plaintiffs and the Class.

356.    Pursuit of administrative remedies against Keurig under the circumstances alleged herein would have been futile.

357.    Alternatively, in some jurisdictions alleged within this claim for relief and only where applicable, there is no adequate remedy at law.

358.    Plaintiffs and members of the following Indirect-Purchaser State Classes seek disgorgement of all profits resulting from such overpayments and establishment of a constructive trust from which Plaintiffs and the Class may seek restitution:

(a)     Arizona Indirect-Purchaser Class;

(b)     California Indirect-Purchaser Class;

(c)     District of Columbia Indirect-Purchaser Class;

(d)     Hawaii Indirect-Purchaser Class;

(e)     Illinois Indirect-Purchaser Class;

(f)     Iowa Indirect-Purchaser Class;

(g)     Kansas Indirect-Purchaser Class;

(h)     Maine Indirect-Purchaser Class;

(i)     Michigan Indirect-Purchaser Class;

(j)     Minnesota Indirect-Purchaser Class;

(k)     Mississippi Indirect-Purchaser Class;

(l)     Nebraska Indirect-Purchaser Class;

(m)     Nevada Indirect-Purchaser Class;

(n)     New Mexico Indirect-Purchaser Class;

(o)     New York Indirect-Purchaser Class;

(p)     Oregon Indirect-Purchaser Class;

(q)     South Dakota Indirect-Purchaser Class;

(r)     Tennessee Indirect-Purchaser Class; and

(s)     Vermont Indirect-Purchaser Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs hereby respectfully request that:

A.      The Court determine that the claims alleged herein under the Sherman Act, state antitrust laws, and state consumer protection and/or unfair competition laws may be maintained as a Class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure;

B.      Appoint Plaintiffs as Class Representatives for the Class and their counsel of record as lead class counsel;

C.      The unlawful agreements, conduct, contracts, conspiracy or combination alleged herein be adjudged and decreed to be:

      1.      A restraint of trade or commerce in violation of Vermont's Consumer Fraud Act;

      2.      A restraint of trade or commerce in violation of California's Cartwright Act and other state antitrust laws alleged herein;

      2.      Violations of the state consumer protection and unfair trade practices laws alleged herein;

      3.      A restraint of trade or commerce in violation of Sections 1 and 2 of the Sherman Act, and Section 3 of the Clayton Act; and

      4.      Acts of unjust enrichment.

C.      Plaintiffs and the Class recover damages, other monetary relief, civil penalties, or consideration given by the Class for K-Cups (or the value thereof), as well as treble damages or up to three times the consideration given by the Class, as provided by state laws, and that a judgment be entered in favor of Plaintiffs and the Class against Keurig, jointly and severally;

D.      Plaintiffs and the Class obtain any penalties, punitive, or exemplary damages, and/or full consideration, where the laws of the respective states identified herein so permit;

E.      Keurig, its affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from in any manner continuing, maintaining, or

renewing the conduct, contract, conspiracy or combination alleged herein, or from entering into any other conspiracy alleged herein, or from entering into any other contract, conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

F.      Plaintiffs and the Class be awarded restitution, including disgorgement of profits where state law permits, obtained by Keurig as a result of their acts of unfair competition and acts of unjust enrichment;

G.      Plaintiffs and the Class be awarded pre- and post-judgment interest, and that that interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

H.      Plaintiffs and the Class recover their costs of this suit, including reasonable attorneys' fees, as provided by law; and

I.      Plaintiffs and the Class have such other, further, and different relief as the case may require and the Court may deem just and proper under the circumstances.

### JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all issues triable by a jury.

DATED: May 27, 2014     Respectfully Submitted,

Bruce L. Simon (*pro hac vice* to be filed)
Robert G. Retana (*pro hac vice* to be filed)
Aaron M. Sheanin (*pro hac vice* to be filed)
**PEARSON, SIMON & WARSHAW, LLP**
44 Montgomery Street, Suite 2450
San Francisco, CA 94104
Telephone: (415) 433-9000
Facsimile:  (415) 433-9008

Patrick M. Ryan (*pro hac vice* to be filed)
William I. Edlund (*pro hac vice* to be filed)
Robert H. Bunzel (*pro hac vice* to be filed)
John F. McLean (*pro hac vice* to be filed)
**BARTKO, ZANKEL, BUNZEL & MILLER**
One Embarcadero Center, Suite 800
San Francisco, CA 94111
Telephone  (415) 956-1900
Facsimile:  (415) 956-1152

**SEGAL MCCAMBRIDGE SINGER & MAHONEY**

By: _____
Steven A. Hart
Brian H. Eldridge (*pro hac vice* to be filed)
Elizabeth A. Schieber (*pro hac vice* to be filed)
Kyle Pozan (*pro hac vice* to be filed)
233 S. Wacker Drive, Suite 5500
Chicago, IL 60606
Telephone: (312) 645-7800
Facsimile:  (312) 645-7711

P. John Brady (*pro hac vice* to be filed)
Daniel D. Owen (*pro hac vice* to be filed)
G. Gabriel Zorogastua (*pro hac vice* to be filed)
**POLSINELLI**
900 W. 48th Place, Suite 900
Kansas City, MO 64112
Telephone  (816) 753-1000
Facsimile:  (816) 753-1536

*Attorneys for Plaintiffs and the Proposed Class*